IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

―――――――――――――――――――――      :    Civil Action
DAVID STEVENSON                              :    (capital habeas corpus)
                                             :
            Petitioner,                      :    Case No. 1:07-cv-00473-GMS
                                             :
      v.                                     :    **DEATH PENALTY CASE**
                                             :
CARL C. DANBERG,                             :
      Commissioner,                          :
      Delaware Department of Corrections     :
            Respondent.                      :
―――――――――――――――――――――

PETITION FOR A WRIT OF HABEAS CORPUS
BY A PRISONER IN STATE CUSTODY[1]

―――――――――――――――――――――――――――――――

      Petitioner, DAVID STEVENSON, through undersigned counsel, files this petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254.

―――――――――――――――

      [1]All emphasis is supplied unless otherwise noted.  The record will be cited as "NT (date) at
(page number)."

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING EXHAUSTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

CLAIMS RELATED TO GUILT PHASE OF TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED DUE TO THE TRIAL JUDGE'S BIAS
        AND/OR CONFLICT OF INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     PETITIONER'S RIGHT TO A FAIR TRIAL AND HIS RIGHT TO DUE PROCESS WERE VIOLATED
        WHEN HE WAS TRIED JOINTLY WITH THE CO-DEFENDANT . . . . . . . . . . . . . . . . . . . . . 5

III.    PETITIONER'S RIGHTS TO A FAIR JURY AND TO DUE PROCESS WERE VIOLATED WHEN THE
        COURT ERRONEOUSLY INSTRUCTED THE JURY REGARDING REASONABLE DOUBT, PRIOR
        INCONSISTENT STATEMENTS AND ACCOMPLICE LIABILITY AND WHERE PETITIONER'S
        COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Accomplice Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      Reasonable Doubt Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        C.      Prior Inconsistent Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.     PETITIONER'S RIGHT TO A FAIR AND IMPARTIAL TRIAL WAS VIOLATED WHEN THE
        PROSECUTION MADE INFLAMMATORY, PREJUDICIAL AND IMPROPER REMARKS TO THE JURY
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

V.      PETITIONER'S ATTORNEYS RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO
        PRESENT EXCULPATORY EVIDENCE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE
        FIFTH, SIXTH AND FOURTEENTH AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

VI.     PETITIONER'S RIGHT TO A FAIR TRIAL AND TO DUE PROCESS WAS VIOLATED WHEN THE
        PROSECUTION SUBMITTED EVIDENCE OF OTHER CRIMES TO THE JURY AND WAS PERMITTED
        TO READ PETITIONER'S STATEMENT REGARDING THE UNDERLYING THEFT CHARGE . . 20

CLAIMS RELATED TO THE PENALTY PHASE OF TRIAL . . . . . . . . . . . . . . . . . . . . . . . . 22

VII.  ERRORS IN THE JURY INSTRUCTIONS PRECLUDED PETITIONER'S CAPITAL SENTENCING JURY
      FROM GIVING FULL EFFECT TO MITIGATING EVIDENCE, IN VIOLATION OF THE EIGHTH
      AMENDMENT; TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE
      THIS ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VIII. THE STATE'S PEREMPTORY STRIKES ON THE BASIS OF RACE VIOLATED PETITIONER'S RIGHT
      TO A FAIR TRIAL BY AN IMPARTIAL JURY, AS PROTECTED BY ARTICLE 1, SECTION 7 OF THE
      DELAWARE CONSTITUTION, AND THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH
      AMENDMENT TO THE UNITED STATES CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IX.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO DEVELOP AND PRESENT PETITIONER'S
      YOUTH AS A MITIGATING CIRCUMSTANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

X.    PETITIONER'S DEATH SENTENCE IS UNCONSTITUTIONAL UNDER THE 5TH, 6TH, 8TH AND 14TH
      AMENDMENTS, DUE TO INFIRMITIES IN THE SENTENCING PROCEDURE IN HIS CASE . . . . 36

XI.   THE DEATH PENALTY IS UNCONSTITUTIONAL, FACIALLY AND AS APPLIED, BECAUSE THE
      STATUTORY SCHEME FAILS TO GENUINELY NARROW THE CLASS OF PERSONS ELIGIBLE FOR
      THE DEATH PENALTY IN VIOLATION OF DUE PROCESS AND THE EIGHTH AMENDMENT . 38

XII.  PETITIONER IS ENTITLED TO RELIEF BECAUSE TRIAL COUNSEL PROVIDED INEFFECTIVE
      ASSISTANCE AT THE PENALTY PHASE OF HIS CAPITAL TRIAL . . . . . . . . . . . . . . . . . . . . . 40

      A.    Counsel Failed to Develop and Present Crucial, Available Life History and Mental
            Health Evidence In Mitigation of Punishment in This Capital Case . . . . . . . . . . 40

      B.    Readily Available Mitigating Evidence that Counsel Could and Should have
            Developed and Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

XIII. PETITIONER WAS DENIED A FAIR PENALTY HEARING BEFORE AN IMPARTIAL TRIBUNAL DUE
      TO THE RE-SENTENCING COURT'S DENIAL OF HIS MOTION FOR RECUSAL IN VIOLATION OF
      DUE PROCESS AND THE EIGHTH AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

XIV.  PETITIONER'S RIGHT TO A FAIR SENTENCING AND HIS EIGHTH AMENDMENT RIGHT TO
      INDIVIDUALIZED CONSIDERATION OF AGGRAVATION AND MITIGATION WERE VIOLATED BY
      THE JOINDER OF HIS PENALTY PHASE HEARING WITH THAT OF THE CO-DEFENDANT . . . 56

XV.   PETITIONER'S RIGHT TO A FAIR SENTENCING HEARING WAS VIOLATED BY THE COURT'S
      ERRONEOUS INSTRUCTION REGARDING REASONABLE DOUBT, IN VIOLATION OF THE SIXTH,
      EIGHTH AND FOURTEENTH AMENDMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

XVI.    PETITIONER'S RIGHT TO A FAIR SENTENCING PROCEEDING, AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS, WAS VIOLATED BY THE COURT'S INSTRUCTION TO THE SENTENCING JURY REGARDING ACCOMPLICE LIABILITY .................. 59

XVII.   PETITIONER'S RIGHT TO A FAIR SENTENCING WAS VIOLATED WHEN THE JURY AND THE SENTENCING COURT CONSIDERED AGGRAVATING CIRCUMSTANCES THAT WERE NOT PROVEN BEYOND A REASONABLE DOUBT OR TO A UNANIMOUS JURY .............. 61

XVIII.  PETITIONER'S DEATH SENTENCE IS INVALID UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS BECAUSE THE STATE COURTS HAVE NEVER MADE A RELIABLE DETERMINATION AS TO WHETHER PETITIONER IS SUBJECT TO THE DEATH PENALTY AS ONE WHO HAS KILLED, ATTEMPTED TO KILL, INTENDED THAT A KILLING TAKE PLACE OR THAT LETHAL FORCE BE USED ................................................. 63

XIX.    PETITIONER'S RIGHT TO A FAIR SENTENCING HEARING WAS VIOLATED WHEN THE PROSECUTION WAS IMPROPERLY PERMITTED TO READ PRIOR TESTIMONY OF WITNESSES WHO WERE NOT UNAVAILABLE AND WHERE COUNSEL FAILED TO OBJECT .......... 65

XX.     IN ADDITION TO THE FOREGOING CLAIMS, PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED IN THE FOLLOWING WAYS ........................................ 66

XXI.    PETITIONER'S CONVICTION AND SENTENCE SHOULD BE VACATED BECAUSE OF INEFFECTIVE ASSISTANCE OF TRIAL, DIRECT APPEAL, AND POST-CONVICTION, AND RE-SENTENCING COUNSEL ......................................................... 67

XXII.   PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS DESCRIBED HEREIN .......................................... 68

PRAYER FOR RELIEF .................................................... 70

## PROCEDURAL HISTORY

1.      On November 13, 1996, Petitioner was convicted of first degree murder and related charges.  The jury recommended a sentence of death by a vote of eight to four.  On January 10, 1997, the trial court sentenced Petitioner to death.

2.      Petitioner's convictions and sentence were affirmed on appeal.  Stevenson v. State, 709 A.2d  619 (Del. 1998).  The United States Supreme Court denied certiorari.  Stevenson v. Delaware, 525 U.S. 967 (1998).

3.      On December 14, 1998, Petitioner filed a motion to recuse the trial court, which the court denied on January 8, 1999.  State v. Stevenson, 1999 Del. Super. Lexis 118.

4.      On February 8, 1999, Petitioner filed a motion for post conviction relief pursuant to Rule 61 of the Delaware Superior Court Rules of Criminal Procedure, which was denied by the court on December 21, 1999.  State v. Stevenson, 1999 Del. Super. Lexis 618.

5.      On May 30, 2001, the Delaware Supreme Court reversed the Superior Court's denial of post conviction relief, ordered a new penalty hearing, and directed that the guilt phase claims raised in post conviction be considered by a newly assigned judge.  Stevenson v. State, Manley v. State, 782 A.2d 249 (Del. 2001).

6.      On October 2, 2003, after considering amendments and holding an evidentiary hearing, the Superior Court denied all remaining claims in a memorandum opinion.  State v. Manley, State v. Stevenson, Del. Super., Nos. IN95-11-1047-1049, IN95-12-0687-0689, Herlihy, J. (October 2, 2003), Appendix.  This decision was affirmed on appeal on October 18, 2004.  Stevenson v. State, 2004 Del. Lexis 168.

7.      After a second penalty phase, by a vote of ten to two, the jury recommended a sentence of death on December 6, 2005.  The court sentenced Petitioner to death on February 3, 2006.  The Delaware Supreme Court affirmed the sentence on January 3, 2007.  Stevenson v.

1

<u>State</u>, 918 A.2d 321 (Del. 2007).

8.    On August 14, 2007, after considering a petition filed with this Court, the Court appointed undersigned counsel and granted *in forma pauperis* status.

## STATEMENT REGARDING EXHAUSTION

9.    Rule 5 of the Rules Governing § 2254 Cases places on the Respondent the burden of raising exhaustion-related issues in its answer to the habeas petition.  <u>E.g.</u>, Rule 5 ("The answer shall respond to the allegations of the petition.  In addition it shall state whether the petitioner has exhausted his state remedies"); <u>Granberry v. Greer</u>, 481 U.S. 129, 134 (1987) (discussing Rule 5; "[w]hen the State answers a habeas corpus petition, it has a duty to advise the district court whether the prisoner has, in fact, exhausted all available state remedies").

10.    While this burden is on the State, Petitioner here notes that some claims presented herein were exhausted, while some are not.  Petitioner has filed a post conviction petition in state court and is in the process of preparing an amendment to that petition.  At the appropriate time, Petitioner will request that this Court hold the habeas proceedings in abeyance while he exhausts the unexhausted claims.  Petitioner is filing this habeas petition at this time because of the unique procedural history of the case.

## GROUNDS FOR RELIEF

11.    By this Petition for a Writ of Habeas Corpus, Petitioner asserts that his conviction and sentence violate the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, for the reasons set forth herein.  To the extent the state court rendered decisions on the merits of any claims, those decisions are contrary to, and/or involve an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; and/or are based on unreasonable determinations of facts in light of the evidence presented in the State court proceedings.

## CLAIMS FOR RELIEF[2]

12.      Due to the errors discussed herein, Petitioner was denied his rights under the

Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution including, but

not limited to: due process; equal protection; fair trial by representative jury; reliable,

individualized capital sentencing; meaningful, valid direct appeal and post-conviction review;

and  effective assistance of counsel.  All allegations and facts set forth in each claim of this

pleading are hereby fully incorporated in all other claims as if restated in their entirety.

### CLAIMS RELATED TO GUILT PHASE OF TRIAL:

**I.      PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED DUE TO THE TRIAL JUDGE'S BIAS AND/OR CONFLICT OF INTEREST.**

13.      The trial judge harbored bias and/or labored under a conflict of interest in this

capital case.  Indeed, because of that bias and the appearance of impropriety, the Delaware

Supreme Court vacated Petitioner's original death sentence and ordered a new penalty hearing.

Stevenson v. State, 782 A.2d 249 (Del. 2001).  The same considerations that led to that result,

also lead to the unmistakable conclusion that the trial court's bias unconstitutionally affected

Petitioner's conviction.  He is entitled to a new trial.

14.      The Supreme Court of the United States has held that "[a] fair trial in a fair

tribunal is a basic requirement of due process.  Fairness of course requires an absence of actual

bias in the trial of cases."  In re Murchison, 349 U.S. 133, 136 (1955).  The Court has also stated

that "every procedure which would offer a possible temptation to the average man as a judge . . .

not to hold the balance nice, clear and true between the State and the accused, denies the latter

---

[2]Petitioner will file an Appendix of exhibits shortly after the filing of this Petition.  Cites to exhibits herein cite to the name of the exhibit as it appears in the index to the Appendix.  The to-be-filed exhibits are incorporated by reference as if pleaded herein in their entirety.  Petitioner proffers that he can prove all disputed issues of fact at an evidentiary hearing.

due process of law." <u>Tumey v. Ohio</u>, 273 U.S. 510, 532 (1927).

15.     Petitioner's pretrial, trial, initial sentencing, and suppression proceedings were conducted before Judge Norman Barron.  Judge Barron could not preside in and adjudicate Petitioner's case impartially, and did not, because of his status as judge presiding over the underlying theft case–together with his request, not disclosed on the record, to preside over the capital case-- and because his twin brother, Tim Barron, was a capital case prosecutor in New Castle County at the time of Petitioner's trial.  Additionally, Judge Barron's brother had also been employed as a security guard in a department store (just as the victim in this case),  while prosecuting cases for the State Attorney General's Office. <u>See</u> Appellant's Opening Brief (2/25/00) at 25, Appendix.  These personal connections to the case created a temptation "not to hold the balance nice, clear and true" between Mr. Stevenson and the State of Delaware.

16.     Trial counsel were ineffective for failing to try to recuse Judge Barron from the case.  After affirmance on direct appeal, Petitioner moved to recuse Judge Barron from presiding over the post-conviction proceedings.  Judge Barron could not and should not have been expected to fairly adjudicate a proceeding in which his own impartiality was being questioned. Nonetheless, Judge Barron presided over the motion to recuse himself, and denied the motion. <u>State v. Stevenson,</u> 1999 Del. Super. LEXIS 118 (January 8, 1999).  That decision was overturned on appeal.   <u>State v. Stevenson</u>, 782 A. 2d 249, 251 (2001) (reversing denial of post-conviction relief and remanding for new penalty hearing).

17.     <u>Inter</u> <u>alia</u>, Judge Barron displayed bias in favor of the State and against Mr. Stevenson by: failing to grant a severance motion when Mr. Stevenson's defense and that of his co-defendant were mutually antagonistic; denying a motion for prior to trial, so that the lawyer

Petitioner's family had hired could represent him at trial; finding that Petitioner's felony theft charges were admissible under an exception to the prohibition of other crime evidence; failing to intervene sua sponte to prevent prosecutorial misconduct in the State's closing argument to the jury; instructing the jury on accomplice liability without requiring the jury to find which defendant was the accomplice and which was the principal; and committing the various other errors that are pleaded throughout this petition.

18.     No deference should be given to any findings or rulings of Judge Barron at the pretrial, trial, sentencing, suppression or post-trial stages. His partiality infected both the guilt and penalty phases of trial equally. The Delaware Supreme Court should have granted Petitioner a new trial, rather than only a new penalty hearing. The lack of an impartial tribunal in this capital case was *per se* prejudicial, and no showing of specific prejudice is required. In the alternative, the State cannot show that the bias of the state court did not substantially and injuriously effect or influence the jury's verdict and affected the process to such an extent as to render petitioner's conviction and sentence fundamentally unfair and unconstitutional. At the very least, Petitioner is entitled to a hearing on this claim.

## II.    PETITIONER'S RIGHT TO A FAIR TRIAL AND HIS RIGHT TO DUE PROCESS WERE VIOLATED WHEN HE WAS TRIED JOINTLY WITH THE CO-DEFENDANT.

19.     Petitioner was tried jointly with co-defendant Michael Manley. Prior to trial, Petitioner moved for severance, which was denied by the court. On appeal, the Delaware Supreme Court affirmed this decision. Commonwealth v. Stevenson, 709 A. 2d 619, 628-630 (Del. 1998). The state court's decision was contrary to or was an unreasonable application of clearly established federal law.

20.     Under the Delaware rules, two or more defendants can be charged in the same indictment, and can therefore be tried jointly, when they are alleged to have participated in the same act or series of acts.  Delaware Superior Court Criminal Rule 8(b).  However, under federal law, the court should grant severance when there is a serious risk that a joint trial would compromise a specific right of a defendant or would prevent the jury from making a reliable determination of guilt or innocence.  The existence of antagonistic defenses is one of the factors to be considered in determining if severance is warranted.  Here, the co-defendant's theory of defense, that Petitioner was the shooter, could not possibly have been more antagonistic.

21.     The State's theory of the case was that Michael Manley shot the victim.  Petitioner was tried under an accomplice liability theory.  Manley's defense, however, was that Petitioner was the shooter.  Manley presented the testimony of Dorothy Hackett, who lived in the apartment complex.  NT 11/8/96 at 2.[3]  She testified that she heard the shots and looked out her window.  Id. at 3.  She identified Petitioner as the man she saw with a gun walking toward her, away from the victim.  Id. at 8.  She testified that she identified Petitioner that same day in a photographic array, id. at 19, and positively identified him in court.  Id. at 20.

22.     This evidence that Petitioner was the shooter would not have been heard by the jury if the defendants had been tried separately.  Indeed, the State did not present this witness.[4]

---

[3]Because of the unavailability of this witness, her testimony was taken on November 8, 1996, by videotaped deposition before the court, but outside the presence of the jury.  Her testimony was played for the jury at the following session, on November 12.

[4]In fact, Petitioner filed a motion to suppress the photographic identification and the in-court identification by this witness.  See Motion to Suppress Identification, Appendix.  However, after being informed by the prosecution that the witness would not be presented, counsel did not litigate the motion.  Counsel was ineffective for failing to renew and litigate that motion once the co-defendant decided to present this witness.

6

The prejudice to Petitioner was further enhanced by Manley's counsel's argument to the jury. Practically the entire closing argument on behalf of Manley, was based upon his contention that Petitioner was the shooter.  See NT 11/12/96 at 83 (bullets found in jacket with University of Delaware basketball schedule, where Petitioner went to school); id. (car belonged to Petitioner; "There's not going to be any debate about that"); id. at 84 (Hackett identified dark shirt like Petitioner was wearing); id. (Hackett saw a gun); id. at 85 (Hackett "positively identified David Stevenson as the person she saw with the gun"); id. at 86-7 ("As Miss Hackett told you, [Manley] didn't have the gun"); id. at 89 ("there was absolutely no doubt in her mind what she saw").  This argument was highly prejudicial to Petitioner.

23.     In fact, immediately after the co-defendant's closing, counsel for Petitioner renewed his motion for severance and requested a mistrial:  "I believe the Court quite obviously heard about ten arguments, approximately, made by [Manley's counsel's] which we believe are antagonistic and contrary to our perception of what is reality in this case."  Id. at 92.  The court again denied this motion.  Id.

24.     The presentation of evidence specifically identifying Petitioner as the shooter, together with the closing argument for the co-defendant, resulted in great prejudice and violated due process.  Petitioner is entitled to a new trial.

III.    PETITIONER'S RIGHTS TO A FAIR JURY AND TO DUE PROCESS WERE VIOLATED WHEN THE COURT ERRONEOUSLY INSTRUCTED THE JURY REGARDING REASONABLE DOUBT, PRIOR INCONSISTENT STATEMENTS AND ACCOMPLICE LIABILITY AND WHERE PETITIONER'S COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT.

25.     The trial court erroneously instructed the jury as to reasonable doubt.  The court's instruction regarding the treatment of prior inconsistent statements was also in error.

7

Additionally, the court lessened the State's burden of proof and allowed the jury to convict

without finding all elements of the offenses charged, by instructing the jury that they could find

Petitioner guilty as an accomplice if they found he intended to aid another in committing <u>some</u> or

all of the acts necessary for the commission of the offense, and in erroneously instructing the

jurors that they did not need to decide unanimously which co-defendant was the actual shooter.

26.     The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment

require that the jury be accurately instructed regarding the law which they are to apply to the

facts.  A jury must be properly instructed regarding its application of reasonable doubt.

Erroneous instructions to the jury, particularly those that lessen the prosecution's burden of proof

and allowed a conviction without a unanimous finding, require that a new trial be granted.  Here,

individually and cumulatively, the improper instructions violated due process.  Petitioner is

entitled to a new trial.

**A.    Accomplice Liability.**

27.     The State's theory of the case was that Manley was the shooter and Petitioner was

his accomplice.  <u>See</u> NT 11/12/96 at 117 (prosecutor arguing in closing that "it makes perfect

sense that Manley is the shooter").  Manley's defense was that Petitioner was the shooter.  <u>See</u>

<u>generally</u> <u>id.</u> at 78-89 (Manley's closing argument).  Petitioner's defense was that he was not an

accomplice to the shooting.  Thus, the question of accomplice liability was the crucial decision

for the jury at the guilt phase.  The court's instruction lessened the burden necessary for the jury

to find Petitioner guilty as an accomplice, and allowed the jury to convict without finding all

elements of the offenses charged.

28.     First, the court instructed the jury that it could find the Petitioner guilty "as an

8

accomplice if he intended to aid another person in committing <u>some</u> or all of the acts necessary for the commission of the offenses." <u>Id.</u> at 130.  This allowed the jury to find accomplice liability without finding all elements of the offense beyond a reasonable doubt.  Indeed, if the jury thought that the state proved that Petitioner intended to aid Manley in acquiring a gun to scare the victim, or merely in a plot to intimidate the witness, this instruction allowed the jury to find Petitioner guilty of first degree murder.  Surely, this was improper.

29.     This error was compounded by the court's instruction regarding which defendant was the actual shooter.  The court told the jury that "there is no requirement that the jury be unanimous as to which of the parties was the principal and which was the accomplice, so long as you are all agreed as to guilt." <u>Id.</u> at 132.  This allowed the jury to speculate as to the facts of the case and to find Petitioner guilty as an accomplice without unanimity and on proof less than beyond a reasonable doubt.

30.     This was particularly egregious since there were conflicting fact patterns presented to the jury regarding who the shooter was.  Indeed, the State presented evidence that Manley was the shooter and argued to the jury that Manley was, in fact, the shooter.  NT 11/12/96 at 117.  And, as stated above, Manley presented a witness who identified Petitioner as the shooter.  Then, the State was permitted to argue that the jury did not need to decide which of the two defendants was the shooter.  <u>Id.</u> at 72.  And the court told the jury the same thing.  <u>Id.</u> at 132.

31.     The Sixth Amendment requires that a jury must find unanimously every element of a crime before convicting a defendant.  This is particularly so in a capital case.  Here, the risk of juror confusion was far too great, particularly when considering the court's erroneous

9

instruction regarding the definition of accomplice, that one can be found guilty if agreeing to

<u>some</u> of the acts required for the crime.  Petitioner was denied his rights under the Sixth and

Fourteenth Amendments, which require a unanimous verdict.[5]

32.    Trial counsel was ineffective for failing to object to these erroneous instructions.

Appellate counsel was similarly ineffective for failing to raise this issue on appeal.  The

performance of all prior counsel was deficient and Petitioner was prejudiced.

**B.    Reasonable Doubt Instruction.**

33.    The court's instruction on reasonable doubt was confusing and fell far below the

constitutional standard of proof required in a criminal case.  This error is even more egregious

considering that Petitioner was sentenced to death.  In defining reasonable doubt in his final

instructions to the jury, the court instructed as follows:

> Reasonable doubt is a practical standard.  On the one hand, in criminal cases, the law imposes a greater burden of proof than it does in civil cases. Proof that a defendant is probably guilty is not sufficient.

> On the other hand, the law recognizes that certainty is rarely possible in matters involving human behavior.  The State is, therefore, not required to prove guilt to a certainty.

> A reasonable doubt is a doubt based on reason and common sense.  It must come from a fair and rational consideration of the evidence, or lack thereof, in a case.

> Reasonable doubt does not mean a vague or speculative doubt or a mere possible doubt.  It is the kind of doubt that a fair, reasonable and intelligent juror would honestly entertain after a careful and conscientious consideration of all of the evidence.

---

[5]This error is also relevant to the second penalty phase, as the court there repeated the erroneous instruction to the sentencing jury regarding accomplice liability.  This error is outlined herein in a separate claim.  <u>See</u> Claim XVI.

NT 11/12/96 at 152-153.  This instruction was far too vague and did not clearly define the standard of proof required to overcome the presumption of innocence.  It is confusing and fails to comply with clearly established Supreme Court precedent.  The charge lessened the burden of proof required to prove Petitioner's guilt and violated due process.

34.     The instruction to Petitioner's jury did not define what quantum of proof is necessary, and never actually defined the standard for beyond a reasonable doubt.  Because there is a reasonable likelihood that the jury applied the instruction in a way that violated the Constitution, the instruction violated due process and the Fifth and Sixth Amendments.

   **C. Prior Inconsistent Statements.**

35.     The court, relying on an unconstitutional provision codified in Delaware, instructed the jury that it could consider prior inconsistent statements of witnesses as substantive evidence.  Indeed, the court even went so far as to tell the jury that "the jury may convict on such statement if it is satisfied beyond a reasonable doubt that the statement is true."  NT 11/12/96 at 149.  This instruction was based upon Delaware law which states that "[i]n a criminal prosecution, the voluntary out-of-court statements of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value."  11 Del. C. § 3507(a).

36.     This provision of law does not comport with the protections afforded an accused by the United States Constitution.  At common law, prior inconsistent statements were not admissible as substantive evidence.  The federal rules allow such evidence to come in substantively only if certain safeguards are in place to ensure the reliability of such statements.  Here, the prior statement was made to police and was not under oath.  There is not sufficient

indicia of reliability to allow its substantive admission.  Moreover, the admission of the witness'

out-of-court testimonial statement to the police as substantive evidence is barred under the

Confrontation Clause.

37.    Mario Cruz testified that he saw Petitioner and the co-defendant on the morning

of the murder.  He stated that Petitioner and Manley were on the front porch when he left for

work at about 7:00 a.m.  NT 10/31/96 at 114.  If credited, that testimony established an alibi.  It

would have been impossible for Petitioner to have left home at 7:00 a.m. and still been at the

Cavalier Apartments at the time the State claimed he arrived.  The prosecutor then impeached

Mr. Cruz with his statement to the police, in which he allegedly stated that Petitioner left the

house at about 6:45.  Id. at 117-120.  While the evidence of this prior statement was admissible

to impeach Cruz's testimony, it was not admissible as substantive evidence to prove that

Petitioner left the house at 6:45.  The court erred in instructing the jury to consider the statement

as substantive evidence, and that a verdict of guilt could be based upon such statement.

38.    These instructional errors individually and cumulatively denied Petitioner due

process and his right to a fair trial.  To the extent that counsel failed to object to these

improprieties, counsel was ineffective.  Appellate counsel was ineffective for failing to raise

these issues on appeal.

## IV.    PETITIONER'S RIGHT TO A FAIR AND IMPARTIAL TRIAL WAS VIOLATED WHEN THE PROSECUTION MADE INFLAMMATORY, PREJUDICIAL AND IMPROPER REMARKS TO THE JURY.

39.    A prosecutor's obligation in trying a criminal case is not merely to attain a

conviction but to ensure that justice is done.  When a prosecutor injects personal opinion or

attempts to have the jury make a determination based on passions and prejudice, due process is

violated.  The Supreme Court has repeatedly recognized that a prosecutor enjoys a unique position of authority in the courtroom, and must seek not convictions, but justice.  Here, the prosecutor overstepped the bounds of zealous advocacy and violated Petitioner's right to a fair trial.

40.     In closing argument, the prosecutor improperly informed the jury that Petitioner had attempted to suppress statements he supposedly gave to Macy's employees incriminating himself in thefts.  The prosecutor told the jury that Petitioner "had already lost the motions he had filed for suppression, to try to keep out his own confessions."  NT 11/12/96 at 47.  It was improper to inform the jury that Petitioner was attempting, based on his constitutional rights, to prevent them from hearing evidence.  Even though this was evidence in the underlying case, the prosecutor improperly created the impression that Petitioner was trying to dupe the jury.  This argument also led the jury to speculate whether there were confessions in the murder case that were not admitted.  Such highly improper remarks violated Petitioner's right to due process.

41.     The prosecutor also repeatedly told the jury that Petitioner committed the thefts from Macy's in spite of the fact that Petitioner was not convicted of those crimes.  Id. at 45-46.  This, too, was improper.

42.     The prosecutor improperly asked the jury to "complete the journey" of justice started by the victim.  Such argument was highly prejudicial.  He told the jury:

That's what he was planning on doing, but that journey was never completed.  It was started, and it was never completed.  It was his journey to head to justice.  It was never done.

But now, today, you have the opportunity to complete that journey.  Justice can be done for Kristopher Heath.  He can't do it for himself.

13

NT 11/12/96 at 77.  This error was repeated in the State's rebuttal summation.  "And it will be your function to finish what was started one year ago today, when Kristopher Heath set out to come to this courtroom and to do justice."  Id. at 123-124.  Petitioner's counsel objected to these comments.  Id. at 126.  His request for a curative instruction was denied.  Id. ("I don't think the State overreached in its closing, and the request is denied").  The prosecutor made this argument to appeal to the passions and prejudice of the jury and to divert their attention from the lack of evidence of guilt.  Such argument was highly improper.  The court erred in overruling the objection and in denying the request for a curative instruction.

43.     The prosecutor also improperly vouched for the credibility of its expert witness, Agent Kinard, of the Bureau of Alcohol, Tobacco and Firearms.  Agent Kinard testified that he performed an atomic absorption test to determine if there was gunpowder residue on the clothing or hands of Petitioner or the co-defendant.  NT 10/31/96 at 130.  None was found.  Agent Kinard went to great lengths to explain to the jury that this result was not surprising.  Id. at 133-134.  Part of the defense strategy was to discredit Agent Kinard's testimony in this regard through cross examination and to argue that the lack of gunshot residue raised a reasonable doubt.  See NT 11/12/96 at 97-99 (Stevenson closing argument).  Thus, the credibility of this witness was a crucial determination for the jury.  Yet, the prosecution was improperly permitted to vouch for his credibility: "His job is not to come in here and do anything for any party but to tell the truth." Id. at 118.  Such vouching was improper and denied Petitioner a fair trial, particularly in light of the dearth of direct evidence of guilt.  The State relied almost exclusively on circumstantial evidence.  Thus, this circumstantial evidence of innocence, that Petitioner had no residue on him, was a critical fact.

14

44. The prosecution improperly demeaned the defense and the defense strategy. For example, the prosecutor stated, "He was in his car ladies and gentlemen. To get you to try to believe otherwise is silly. It's silly." Id. at 111. He also described the defense strategy as "ludicrous." Id. at 109. Such denigration of the defense strategy is improper and violates due process.

45. The prosecution also improperly shifted the burden of proof during his summation. He questioned why the defense did not present an alibi. "If they're not at Cavaliers (sic) Country Club Apartments, where is their alibi witness, Delphine Brown? Where were they?" Id. at 122-123. The law is quite clear that the defense has no burden to present any evidence. The prosecutor's argument that the defense was required to prove alibi was highly improper. Neither Petitioner's counsel nor co-counsel said anything about alibi. Nor did either file any notice of alibi. Putting such a question in the jury's mind shifted the burden of proof and violated due process.

46. To the extent that defense counsel failed to object to all of these improprieties, counsel was ineffective. The failure to object to improper argument by the prosecution amounts to deficient performance. Petitioner was prejudiced by counsel's deficiencies. As stated above, the State's entire case was based upon circumstantial evidence. The prosecution's improper arguments were plainly designed to inflame the jury and take the focus off of the lack of direct evidence of guilt. Petitioner is entitled to a new trial.

15

## V.  PETITIONER'S ATTORNEYS RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO PRESENT EXCULPATORY EVIDENCE IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS.

47.    The State's theory at trial was that Petitioner was the driver of the vehicle identified at the scene and that Manley, the co-defendant, was the shooter.  The State presented several witnesses who described the shooter as a black male.[6]  See NT 10/31/96 at 59 (Susan Butler); id. at 74 (Phillip Hudson); id. at 90 (Lance Thompson).  The State also presented a witness who testified that he saw two men in a car in the parking lot as he left for work and that he believed they were black.  Id. at 43 (Michael Chandler).  Several eyewitnesses would have refuted these facts, but were never called at trial.  Petitioner's counsel were ineffective for failing to present this evidence to the jury.

48.    Police reports that were turned over to the defense prior to trial contained information and statements given by four witnesses, whose accounts of the events differed in significant ways from the theory presented by the State.  NT 2/6/03 at 47-48 (trial counsel's testimony that he was provided police reports).  Indeed, several of these witnesses describe white individuals at the scene, either in the car or leaving the immediate area of the shooting.  Given that Petitioner's attorneys argued that there was reasonable doubt as to Petitioner's involvement in the killing, there was no reasonable basis for counsel's failure to call witnesses who would have directly refuted the State's theory of the case.

49.    Three of these witnesses described the assailants to police as white.  Carol Schweda Trzepacz told police shortly after the shooting that she had seen a man in a car in the

---

[6]Manley is African American.

16

parking lot as she left for work and that <u>man was white</u>.  See Trzepacz Statement, Appendix.[7]

Marlene Farmer Ijames told police shortly after the shooting that she saw a <u>white male</u>, 5'8",

medium build, walk quickly away from the victim, who was lying on the ground, get into the

driver's side of a dark colored vehicle with Delaware tags and drive away.  <u>See</u> Ijames Statement,

Appendix.  Jessica Wing also told police that the <u>driver appeared to be white</u>.  She stated that she

saw a blue car leaving the parking lot just after the shooting and she saw the driver's hands,

which were white.  <u>See</u> Wing Statement, Appendix.

      50.     None of these witnesses were interviewed by the defense or called as witnesses at

trial.  Their testimony would have directly contradicted the eyewitness testimony presented by

the State that both assailants were black.  Indeed, Jessica Wing's statement that the driver was

white directly contradicted the State's theory that Petitioner was the driver.

      51.     At the hearing on Petitioner's post conviction litigation, trial counsel conceded

that he should have presented the four witnesses described above.  NT 2/6/03 at 47 ("if that

witness was deemed to be helpful to us, we should have called them if we did not").  There was

no strategic decision not to call these witnesses.  Counsel's performance was deficient.

Petitioner was prejudiced by counsel's deficiencies as there is a reasonable probability that the

outcome of the proceedings would have been different.

      52.     Counsel was also ineffective for failing to rebut testimony presented by the co-

---

[7]This witness testified at a hearing on Petitioner's Rule 61 petition that the person she saw in the car was white or hispanic.  NT 2/6/03 at 67.  Another witness, Lance Thompson, testified at trial that the person he saw was black, but that he could not describe him.  NT 10/31/96 at 90.  However, in notes taken by Detective Lee, there is an indication that Thompson was unsure of the race of the individual.  <u>See</u> Lee's Notes re: Thompson, Appendix.  Moreover, Thompson has told undersigned counsel that he could not tell the race of the person that he saw enter the car after the shooting.

defendant that Petitioner was the shooter.  As described elsewhere in this petition, Manley's

attorneys presented the testimony of Dorothy Hackett.  Ms. Hackett testified that she heard shots

and looked out the window of her apartment.  She saw a black man with a gun heading toward

her.  NT 11/8/96 at 6-8.  She testified that she identified the man in a photographic array the

same day as the shooting and positively identified Petitioner in court as the man she saw with the

gun.  Id. at 19-20.  This highly damaging testimony was not presented by the State, but by the co-

defendant.[8]

53.    This evidence could have been easily rebutted by the testimony of Phillip Hudson,

a State witness.  Mr. Hudson testified that he heard the shots, looked out his bedroom window,

and saw a man running past.  NT 11/31/96 at 69-70.  He described the man as a black male,

stocky, weighing about two hundred pounds.  Id. at 74.  He was not asked to make an

identification in the courtroom, although he could have.  Indeed, shortly after the shooting, he

was taken to the police station, where he positively identified Manley in a photographic array.

See Hudson Statement, Appendix.  He has also recently informed undersigned counsel that he

recognized Manley in the courtroom and would have identified him if he had been asked.  See

Declaration of Phillip Hudson, Appendix.[9]  As stated above, trial counsel had been provided the

police report.  Yet, counsel failed to present this identification testimony to the jury.  Counsel's

---

[8]Petitioner has submitted that the state court erred in denying his request for severance based, in part, on the admission of this testimony.  See Claim II.

[9]At the second penalty hearing, Manley's attorneys introduced evidence, through a stipulation to Hudson's statement, that he identified Manley in a photographic array.  NT 11/29/05 at 65-66. The jury that convicted Petitioner of first degree murder never heard this testimony.

18

performance was deficient and Petitioner was prejudiced.[10]

54.    Trial counsel was also ineffective for failing to point out multiple inconsistencies in the evidence regarding the arrest of Petitioner.  For example, Officer Danese and Officer Stark were working as partners on the day in question and were in the same vehicle during the chase of the car alleged to have been at the scene.  The differences in their testimony cannot be reconciled.

55.    Officer Stark testified that he was the passenger in the patrol car.  Danese was driving.  Stark testified that as they drove eastbound on Washington, he looked out the passenger window, to his right, and saw the vehicle on Nineteenth Street.  He jumped out and ran toward the car and saw no one near it.  NT 11/4/96 at 134.

56.    Danese, however, testified that as he ran down Nineteenth Street, he saw two individuals near the car whom he chased.  Id. at 91-92; 114-116.  It defies logic that Danese, who was driving the patrol car, could have gotten out of the driver's side, ran around the car and somehow arrived at the scene ahead of his partner.  Counsel never pointed out these inconsistencies to the jury.

57.    Trial counsel was ineffective for all the reasons described above.[11]  Petitioner was prejudiced by counsel's deficient performance.  To the extent that appellate counsel failed to

---

[10]Counsel were also ineffective for failing to present the testimony of Debra Norris at trial. She testified at the second penalty hearing that she saw the shooter run around behind building 10A after the killing.  NT 11/29/05 at 31.  That is the opposite direction from the vehicle that other witnesses described leaving the scene.  This evidence would have further called into question the State's theory that the shooter left the scene in Petitioner's car.  Her statement, consistent with this testimony, was turned over to counsel, but she was never presented to the jury.

[11]Prior to the commencement of trial, Petitioner pointed out to the court that he was unhappy with trial counsel, and requested a continuance.  Petitioner had retained private counsel, but because the trial court denied his request for a continuance, private counsel was unable to represent Petitioner.  NT 10/21/96 at 30.  The court erred in denying this request.

fully develop this issue on appeal, counsel was ineffective.

**VI.** **PETITIONER'S RIGHT TO A FAIR TRIAL AND TO DUE PROCESS WAS VIOLATED WHEN THE PROSECUTION SUBMITTED EVIDENCE OF OTHER CRIMES TO THE JURY AND WAS PERMITTED TO READ PETITIONER'S STATEMENT REGARDING THE UNDERLYING THEFT CHARGE.**

58.     Evidence of other crimes allegedly committed by a defendant is inadmissible except in certain narrow circumstances.  When such evidence is admitted, the jury should be promptly and clearly instructed that the evidence is not admissible to prove guilt.  Here, the court improperly admitted evidence of other crimes and failed to fully instruct the jury regarding such evidence.  The court also improperly admitted Petitioner's statement regarding the Macy's theft.  Such improprieties violated due process and deprived Petitioner of a fair trial.

59.     Petitioner, who was employed at Macy's, was charged with stealing gift certificates from the store.  Kristopher Heath, the victim in this case, was employed in security for Macy's and was involved in the investigation of the thefts.  In spite of the fact that Petitioner had not been convicted of these charges, the court permitted the introduction of these allegations in Petitioner's murder trial.  The court also improperly allowed the admission of Petitioner's statement in connection with the theft charges.  The probative value of that statement was outweighed by the prejudice created by its admission.[12]  Indeed, in the statement that was read to the jury, Petitioner provided details of the thefts, including the technique he used and the dates

---

[12]Additionally, the existence of the statements given to police, wherein Petitioner allegedly admitted to the thefts, negates the motive for the killing alleged by the State.  Regardless of whether Mr. Heath was available for the trial on the theft charges, the admissions to police would have been admitted as evidence.  See NT 11/4/96 at 163-164 (Detective W. Thomas Ford's testimony regarding statements).  Petitioner had already litigated and lost a motion to suppress his statements.  See NT 11/4/96 at 172 (testimony of prosecutor assigned to theft case).  Thus, Petitioner's statements would be admitted regardless of whether Mr. Heath was in court.

involved.  NT 11/4/96 at 48-52.   Such evidence was highly prejudicial and had no probative value with respect to the homicide and related charges.

60.     In addition to the basic error of admitting this evidence, the court further erred in failing to give an immediate limiting instruction to the jury.  The court did instruct the jury in its final instruction, eight days later, in regard to this evidence.  NT 11/12/96 at 146-148.  Because of the highly prejudicial nature of this evidence, however, the court should have instructed the jury at the time of its admission, to avoid any confusion or prejudice.

61.     Further prior bad acts evidence was also improperly admitted.  The court permitted the testimony of Kevin Powlette, who testified that approximately a week before the shooting, Petitioner had told him that he was thinking of getting a gun for his protection.  NT 11/4/96 at 214-215.  That testimony was inadmissible.

62.     First, this evidence was not relevant.  The State has never contended that Petitioner was the shooter or that he ever possessed a gun in connection with this crime.  Indeed, the State's theory was that the co-defendant possessed the gun and that additional bullets were recovered in co-defentant's coat pocket.  NT 10/30/96 at 146.

63.     Additionally, this testimony regarding Petitioner's statement was hearsay.  It was an out-of-court statement that was certainly offered for the truth of the matter asserted.  The State argued at trial that the statement was admissible as an admission against penal interest.  Id. at 201-202.  However, since there was never any evidence that Petitioner possessed a gun, it is not such an admission against interest.  Moreover, Petitioner's statement that he was considering getting a gun was not against penal interest, since it is not illegal to own a gun.  In any event, the prejudicial nature of this evidence far outweighs any probative value.

21

64.     The court's admission of other crimes evidence regarding the theft charges, Petitioner's statement in regard to those charges and the statement allegedly made by Petitioner regarding getting a gun violated due process and Petitioner's right to a fair trial.  To the extent that counsel failed to fully object to the admission of this improper evidence and failed to ensure proper curative instructions, counsel was ineffective.  Counsel was also ineffective on appeal for failing to fully raise these issues.   Petitioner is entitled to a new trial.

### CLAIMS RELATED TO THE PENALTY PHASE OF TRIAL:

**VII.    ERRORS IN THE JURY INSTRUCTIONS PRECLUDED PETITIONER'S CAPITAL SENTENCING JURY FROM GIVING FULL EFFECT TO MITIGATING EVIDENCE, IN VIOLATION OF THE EIGHTH AMENDMENT; TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THIS ISSUE.**

65.     The jury instructions at capital sentencing must properly guide the jury through the process of imposing sentence to ensure the jury decision is made constitutionally.  Improper instructions on aggravating and mitigating circumstances, burdens of proof, unanimity, and weighing implicate the Eighth and Fourteenth Amendment's prohibition on arbitrary or capricious capital sentencing.  Trial and appellate counsel were ineffective for failure to raise these issues, in violation of the Sixth and Fourteenth Amendments.

66.     The jury instructions at Petitioner's capital sentencing trial were improper in multiple respects.  First, the instructions regarding jury unanimity were confusing.  It is reasonably likely that the jury understood the instructions to allow the non-unanimous finding of a statutory aggravating circumstance.  Second, the trial court instructed the jury that individual jurors could consider any aggravating circumstances, <u>even those not found by a unanimous jury</u>.  Third, the trial court failed to inform the jury of the burden of proof that applies to mitigating

circumstances, thus improperly restricting the jury's ability to consider and give full effect to mitigating evidence. Fourth, the instructions improperly defined mitigating circumstances, again unconstitutionally limiting the mitigating evidence considered and given effect by the jury. Fifth, as described in Claim XV, the jury instructions failed to properly define reasonable doubt.

67.    The jury charge was so confusing as to make it reasonably likely that the jury understood that the finding of statutory aggravating circumstances need not be unanimous. The jury was instructed that during the weighing process, unanimity was not required for consideration of aggravating circumstances:

> [A]s to the sentencing recommendation question, you do not have to unanimously agree that a particular aggravating or mitigating circumstances has been established as to a particular defendant in order for you to individually consider such an aggravating or mitigating circumstance.

NT 12/5/05 at 143-44. Immediately following this instruction, the trial court read each of the four statutory aggravating circumstances argued by the State and instructed the jurors, "In order to find that the above statutory aggravating circumstance has been established, you must find that the State has established all of the following elements beyond a reasonable doubt." NT 12/5/05, 144, 145, 146. This instruction omitted the crucial word "unanimously." There is a reasonable likelihood the jury did not understand – especially given the previous instruction that aggravating circumstances need not be found unanimously to be considered during the weighing process – that the aggravating factors must be found unanimously.

68.    The only jury charge describing the weighing determination misstated the law regarding the weighing process, and therefore created a barrier to the sentencer giving full effect to mitigating evidence in violation of the Eighth and Fourteenth Amendments. The trial court

instructed the sentencing jury:

> Each of you must weigh in the balance any aggravating or mitigating circumstance as to a particular defendant that in your mind has been established by the evidence, whether or not any other jurors are likewise convinced.

NT 12/5/05 at 143.  The phrase "in your mind has been established by the evidence" is not a legal burden of proof, and certainly does not describe reasonable doubt.  Thus, the jurors were instructed to consider any aggravating circumstances, including those that they had not found beyond a reasonable doubt.[13]

69.    The purpose of the requirement that aggravating circumstances be found beyond a reasonable doubt is to prevent arbitrary or capricious imposition of the death penalty.  By instructing the jury to weigh aggravating circumstances that were not found beyond a reasonable doubt, the trial court allowed arbitrary or capricious sentencing and skewed the process in favor of death.[14]  Although the jury did not find unanimously all of the aggravating circumstances argued by the State, individual jurors in their weighing determinations may have considered the statutory aggravating circumstance that was not unanimously found beyond a reasonable doubt, as well as any or all of the non-statutory aggravating circumstances, none of which were required to be found beyond a reasonable doubt.

70.    The trial court did not inform the sentencing jury that the proper burden of proof to apply to mitigating circumstances is preponderance of the evidence.  The trial court explained

---

[13]In fact, this was the intention of the trial court.  See NT 12/1/05 at 17-22 for a discussion of this instruction.

[14]The State argued four statutory and eight non-statutory aggravating circumstances.  The jury's findings on the non-statutory aggravating circumstances are unknown, although the jury was instructed to consider non-statutory aggravating circumstances in the weighing process. NT 12/5/05 at 139.

that at least one aggravating circumstance must be found beyond a reasonable doubt.  See NT

12/5/05 at 135, 138, 144, 145, 146, 147.  At no time during the jury charge did the court state a

burden of proof for mitigating circumstances.  Thus, the instructions led the jury to believe,

incorrectly, that mitigating circumstances must be found beyond a reasonable doubt.  The jury

instructions thus created a barrier to the sentencer's consideration of all mitigating evidence, and

violated Petitioner's Eighth and Fourteenth Amendment rights.

71.    In its preliminary instructions to the jury, the trial court gave the following

instruction regarding aggravating and mitigating circumstances:

> The burden is upon the State to prove beyond a reasonable doubt all of the facts
> necessary to establish each and every element of each of the four statutory
> aggravating circumstances to each defendant. . . . The law does not specify
> mitigating circumstances, but the defense may offer evidence relating to any
> mitigating circumstance which it contends exists in a particular case.

NT 11/16/05 at 25.  The trial court explained that the jury must find aggravating circumstances

beyond a reasonable doubt and defined reasonable doubt, NT 11/16/05 at 26-27, but did not at

any time explain that the correct burden of proof to apply to mitigating circumstances is the

preponderance standard.  A reasonable juror would understand from these instructions that

mitigating circumstances as well as aggravating circumstances must be found beyond a

reasonable doubt.

72.    In describing the weighing process, the court used the same wording to describe

the jury's determination of both aggravating and mitigating circumstances: "the aggravating

circumstances found to exist outweigh the mitigating circumstances found to exist."  NT

11/16/05 at 29.  A reasonable juror would conclude from this instruction that any finding as to

aggravating and mitigating circumstances is considered with the same burden of proof.

25

73.     The trial court's constitutionally infirm instructions continued in the closing

penalty phase charge:

> The burden is on the State to establish beyond a reasonable doubt the existence of
> any statutory aggravating circumstance. ...  If the jury finds beyond a reasonable
> doubt the existence of one or more statutory aggravating circumstances for a
> particular defendant, the jury shall then report to the Court by the number of
> affirmative and negative votes as to such defendant its recommendation on the
> question as to whether, by a preponderance of the evidence, after weighing all
> relevant evidence in aggravation or mitigation which bears upon the particular
> circumstances or details of the commission of the offense and the character and
> propensities of the offender, the aggravating circumstances <u>found to exist</u>
> outweigh the mitigating circumstances <u>found to exist</u>.

TR 12/5/05, 141-142.  Again, the trial court referred to aggravating and mitigating with the

identical phrase, "found to exist." The instructions also specify the different burden of proof for

the weighing process – the preponderance standard.  A reasonable juror would conclude that

aggravating and mitigating circumstances are given the same burden of proof, and that the

weighing process uses a different burden of proof.  Because the jury most likely applied the

reasonable doubt standard to mitigating circumstances, there is a reasonable possibility that the

jurors failed to find, and thus failed to give full effect to, mitigating circumstances.

74.     The trial court's definition of mitigating circumstances unconstitutionally required

a nexus between the mitigating circumstance and the criminal conduct.  The trial court told the

jury:

> A mitigating circumstance is any factor which bears upon the particular
> circumstance or details of the offense or the character and propensities of the
> particular defendant <u>which tends to make that particular defendant's conduct less
> serious</u>, and, thus, makes the imposition of the penalty of life imprisonment . . .
> more appropriate.

NT 12/5/05 at 139.  The phrase "which tends to make that particular defendant's conduct less

26

serious" requires that mitigating evidence be linked to the defendant's conduct and make that conduct "less serious." This is constitutional error. A capital sentencing jury must be allowed to consider a wide range of information concerning the background of the defendant. Evidence extraneous to the crime is relevant. This instruction precluded the jury from giving full effect to mitigating evidence.

75.    Individually and cumulatively, these multiple errors in the jury instructions served to confuse the jury regarding the definition of aggravating and mitigating circumstances, the burdens of proof, unanimity, and weighing, particularly when considered in conjunction with the inadequate reasonable doubt instruction. See Claim XV.

76.    Counsel was ineffective for failing to seek proper instructions at the outset of the penalty phase proceedings and when the judge instructed the jury, and for failing to object. Appellate counsel was ineffective for failing to litigate this issue on direct appeal. These errors deprived Petitioner of his rights under the Sixth, Eighth and Fourteenth Amendments. Petitioner is entitled to a new sentencing hearing.

## VIII. THE STATE'S PEREMPTORY STRIKES ON THE BASIS OF RACE VIOLATED PETITIONER'S RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY, AS PROTECTED BY ARTICLE 1, SECTION 7 OF THE DELAWARE CONSTITUTION, AND THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

77.    This crime took place in overwhelmingly-white Newark, Delaware.[15]  Petitioner and co-defendant Michael Manley, both young African-American men from Philadelphia, had been found guilty of the fatal shooting of Kristopher Heath, a white man. Deborah Dorsey

---

[15]As of the 2000 U.S. census, Newark's population of 28,547 people was 87% white and 6% black. (http://factfinder.census.gov/servlet/GCTTable?_bm=n&_lang=en&mt_name=DEC_200 0_PL_U_GCTPL_ST7&format=ST-7&_box_head_nbr=GCT-PL&ds_name=DEC_2000_PL_U &geo_id=04000US10, last accessed Feb. 6, 2008).

Crowell, Heath's girlfriend and a penalty-phase victim impact witness, is also white. In this atmosphere, racially charged due to the nature of the crime and the race of the defendants and the victim, African Americans were unconstitutionally excluded from the jury that decided whether to sentence Petitioner to life in prison or to death.

78.    During jury selection, the State exercised its peremptory challenges in a racially discriminatory manner, in violation of the equal protection clause of the Fourteenth Amendment. See Batson v. Kentucky, 476 U.S. 79 (1986). A new sentencing hearing is required.

79.    The State used peremptory strikes to exclude more than half of the African-American venirepersons who remained after excusals for cause. Nine African Americans in the venire were not excused for cause.[16] The State used peremptory strikes to exclude five of those nine people from the jury – 55% of the remaining African-American venirepersons.[17] In comparison, the State struck six of the remaining thirty-seven white venirepersons who remained after cause excusals – only 16% of them. Defendant Manley used one peremptory strike against an African American; two African Americans were seated on the jury;[18] and one was selected as an alternate.[19] The State used eleven peremptory strikes during the jury selection process. Thus,

_____

[16]Forty-seven (47) potential jurors were not excused for cause. Of those, 37 (78.73%) were white, 9 (19.14%) were African American, and one (2.12%) was Hispanic.

[17]Myrtle Jackson, NT 11/10/05 at 127; Carla Crowder, NT 11/14/05 at 67; Labrina Ringgold, NT 11/14/05 at 125; Samuel Brown, Jr., NT 11/14/05 at 221; and Brad Thomas, NT 11/15/05 at 19.

[18]Stephen Roberts, NT 11/8/05 at 56 was seated as Juror #1; Robert Jenkins, NT 11/10/05 at 211 was seated as Juror #6.

[19]Kimberly Morton, NT 11/15/05 at 173, was seated as Alternate #1. None of the alternates selected in this case participated in deliberations. NT 12/5/05 at 159-160 (excusing the alternates before the start of deliberations).

although African Americans made up only 14% of the venire,[20] the State used 55% of its

peremptory strikes to exclude African Americans from Petitioner's jury.

  80.  In <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), the Supreme Court set forth a three-

step inquiry: first, the defendant makes a prima facie showing of racial discrimination; second,

the prosecution must articulate a race-neutral explanation for its use of peremptory challenges;

third, the trial court must determine whether the defendant has established purposeful

discrimination.

  81.  In this case, defense counsel raised a <u>Batson</u> objection, but the trial court

improperly failed to find a prima facie case, and prematurely ended the inquiry at step one.

  82.  Petitioner's counsel raised a <u>Batson</u> objection after the State's second strike of an

African-American venireperson:

> Mr. Capone: I'd like to make a Batson objection then. I didn't see anything
>        wrong with that juror.

NT 11/14/05 at 67.  Apparently intending to apply the first step of a <u>Batson</u> inquiry, the trial

court asked counsel, "What pattern do you see?"  NT 11/14/05 at 68.  Defense counsel stated the

State's third and fourth strikes were made against African Americans, and the State responded

that there was no pattern because the first two strikes were against white people.  After

discussion, the Court stated:

> All right. I'm satisfied at this point that there is no improper pattern violative of
> Batson or any of its progeny in the State's exercise of its peremptory challenges.

NT 11/14/05 at 73.  After further discussion, the Court stated again:

---

  [20]Based on the Superior Court's Juror Profile, dated 11/8/2005, 174 people were called in
the venire for Mr. Stevenson's penalty trial.  Of those, 135 (77.58%) were identified as white, and
25 (14.36%) were identified as black.

> Since I have not found an improper or unconstitutional pattern to the State's
> exercise of its peremptories, I don't find that that application at this point is
> timely, however, again, it will be kept under advisement.

NT 11/14/05 at 76.

83.    After the exercise of the State's ninth peremptory strike, and its fifth strike of an

African-American venireperson, the trial court raised the Batson issue *sua sponte*, but again

found that no prima facie case was established, without even asking defense counsel to argue for

a prima facie case. The Court said:

> I'm suggesting if there's another one, there will be a pattern. . . .  and I do not
> believe a prior pattern has been established nor do I believe a pattern has been
> established with your use of a peremptory challenge with this particular juror.

NT 11/15/08 at 21.

84.    The trial court erred in applying the first step of the inquiry.  A pattern is not a

prerequisite to establishing a prima facie case.  The Supreme Court in Batson declined to adopt a

bright-line rule for a prima facie case; although a pattern of strikes is a factor, it is not the only

way to make the prima facie showing.  Moreover, a record that the excluded venireperson is the

same race as the defendant can be sufficient to establish a prima facie case.

85.    In this case, counsel showed that the State had used peremptory strikes against

people of the same race as the defendants, and that the State used a disproportionate number of

peremptory challenges against a particular racial group.  The trial court failed to accept this prima

facie showing and move on to the second step of the inquiry.  This was error.

86.    To the extent trial counsel failed to fully raise Batson objections, counsel was

ineffective.  Appellate counsel was ineffective for failing to litigate this issue on direct appeal.

Petitioner is entitled to a new sentencing hearing before a constitutionally-selected jury.

IX.    **TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO DEVELOP AND PRESENT PETITIONER'S YOUTH AS A MITIGATING CIRCUMSTANCE.**

87.    At the time of the offense, Petitioner was only 21 years old.  Under federal law, Mr. Stevenson was entitled to the jury and the trial court's full recognition and consideration of any and all factors mitigating in favor of life imprisonment without parole, including his age. Counsel failed to develop and present Petitioner's youthful age as a mitigating circumstance. This failure was deficient, because youth – age up to the early 20s – has been recognized as a mitigating circumstance by the Supreme Court for decades.  Counsel's failure to tell the jury that youth is a mitigating circumstance was also prejudicial.  Had counsel developed and presented this mitigating circumstance, the jury and the trial court would have learned that they should consider Petitioner's age at the time of the crime as a mitigating circumstance, and the legal and scientific bases for the mitigating effects of youth.

**Deficient Performance**

88.    The capital sentencer's consideration of mitigating factors – any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death –  is a central component of the Eighth Amendment's individualized sentencing requirement.  The seminal cases establishing the mitigation requirement include consideration of youthful age as a mitigating circumstance.[21]

89.    In <u>Roper v. Simmons</u>, 543 U.S. 551 (2005) – decided several months before the penalty proceeding in this case –  the Supreme Court held that the Eighth and Fourteenth Amendments prohibit the death penalty for juvenile defendants, because of juveniles' diminished

---

[21]In addition, twenty-five of the twenty-eight states that enumerate statutory mitigating circumstances include youth or age as a mitigating circumstance.

culpability. Although the Court used a bright-line test of 18 years of age, the Court also

recognized that "[t]he qualities that distinguish juveniles from adults do not disappear when an

individual turns 18. " Id. at 574.

90.    The Roper decision was well known and widely publicized. It relied in part on

the developing scientific understanding of the way in which the brain develops in adolescence

and young adulthood. Professionally reasonable counsel representing a capital defendant who

was 21 at the time of the offense would have reviewed Roper and at least some of the scientific

literature, which was outlined in the opinion and the amicus briefs. Effective counsel would then

have sought the assistance of one or more experts who could further explain the mitigating

significance of Petitioner's youth. Here, counsel took none of these steps.

91.    At Petitioner's capital sentencing trial in November 2005, defense counsel did not

present Petitioner's age as a mitigating circumstance – despite including "the youthful age of the

defendant" in the Notice of Mitigating Circumstances to Judge Herlihy in a letter dated

September 8, 2005. See Letter to Judge Herlihy, 9/8/05, Appendix. At the sentencing trial,

counsel made three passing references to David's age,[22] but at no time did defense counsel tell

the jury that age could be considered as a mitigating factor. Counsel certainly knew that youthful

age could be a mitigating circumstance; in fact counsel included it in the Notice of Mitigating

Circumstances.

---

[22]NT 11/16/05 at 77: "David was a pretty good guy. At this time, he was 21 years old. He was a college student." (Defense opening statement); NT 11/16/05 at 79: "And this was a young man that had a bright future and he's going to sit in jail and he's going to sit in a cage and he's going to wear suits like that orange suit that he's wearing today." (Defense opening statement); NT 12/5/05 at 47: "What kind of guy was David Stevenson?  Well, he was a young guy, he was a college boy." (Defense closing statement).

92.     Not only did counsel fail to tell the jury that they could consider David's young age at the time of the crime as a mitigating circumstance – a particularly important reminder where, as here, the sentencing hearing took place ten years after the crime and Mr. Stevenson was ten years older in the courtroom – counsel also failed to develop age as a mitigating circumstance.  Counsel's failure to investigate, develop and present the significance of Petitioner's youth amounted to deficient performance.

**Prejudice**

93.     Trial counsel's failure to develop and present Petitioner's age as a mitigating circumstance prejudiced the outcome of the sentencing trial.  Had counsel properly developed and presented this claim, the jury and the trial judge would have heard extensive scientific evidence that the brain continues to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics relevant to moral culpability.  Much of this evidence had recently been considered constitutionally relevant by the Supreme Court in Roper v. Simmons.

94.     The American Medical Association, the American Psychiatric Association, the American Society for Adolescent Psychiatry, the American Academy of Child & Adolescent Psychiatry, the American Academy of Psychiatry and the Law, the National Association of Social Workers, the Missouri Chapter of the National Association of Social Workers, and the National Mental Health Association filed an amicus brief in Roper.

95.     The amicus brief explains the scientific data documenting that the adolescent brain is physiologically under-developed in areas that control impulse, foresee consequences, and temper emotions.  More importantly for Petitioner, studies cited within the amicus brief

33

document that the brain does not cease to mature until the early 20s, in those relevant parts of the brain governing impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics.   Because the subjects of some of these studies included individuals who were the same age or older than Mr. Stevenson at the time of the crime,[23] the conclusions and arguments made in the amicus brief are equally applicable to him.

96.     Following the initial explanation of the anatomical nature of the adolescent brain, the amicus brief reflects on how serious psychological disturbances exacerbate the already existing vulnerabilities of youth, and result in substandard levels of functioning.   The brief discusses the scientific literature and concludes:

1)     adolescents are inherently more prone to risk-taking behavior and less capable of resisting impulses because of cognitive and other deficiencies;

2)     brain studies establish an anatomical basis for adolescent behavior;

3)     research shows that adolescent brains are more active in regions related to aggression, anger, and fear, and less active in regions related to impulse control, risk assessment, and moral reasoning than adult brains;

4)     adolescent brains are not fully developed in regions related to reasoning, risk taking, and impulse control.

Amicus Brief (headings).

97.     Had the jury and the trial court heard an expert presentation on the behavioral implications of incomplete brain maturation in people Petitioner's age at the time of the crime,

---

[23]See e.g. examples in footnote 55 of the brief: "See Gogtay, *supra* note 27, at 8174 (subjects of study aged 4 to 21 years); Giedd, *supra* note 31, at 861 (subjects of study aged 4.2 to 21.6 years); Sowell (1999), *supra* note 31, at 860-61 (subjects of study aged 12 to 16 and 23 to 30 years); *see also* Sowell (2001), *supra* note 30, at 8026 (noting pronounced brain maturational processes continuing into post-adolescence; subjects of study aged 7 to 30 years); Sowell(2003), *supra* note 32, at 309 (subjects of study aged 7 to 87 years)." Amicus Brief of AMA, APA, et al. filed with the U.S. Supreme Court in Roper v. Simmons, No. 03-633 ("Amicus Brief") at 16, note 55, Appendix.

they would have been able to put into context the inexplicable nature of the shooting.  In fact,

trial counsel's theory at sentencing relied on the argument that Petitioner had  "no reason" to kill

Heath:

> There was really nothing David had to worry about in connection with this. Was this prosecution such a big deal to him? Who would kill somebody when that's the limited exposure you're facing? . . . . He really had nothing to fear from this prosecution. There was really no reason for David to kill somebody to get out of this prosecution.

NT 12/5/05 at 43.  Instead of using this as a springboard for explaining to the jury the effects of

immature brain development on behavior, including abstraction and reasoning, impulse control

and planning, and attention and memory, trial counsel proposed that the senseless nature of the

crime indicated that <u>someone else did it</u>:

> Would David benefit by killing Kristopher Heath? . . . . Now, was there someone else who benefitted? . . . . So who was this third person? Who else would have an interest in this theft case?

NT 12/5/05 at 45.  Despite the fact that the defense had not presented an alternate suspect, and

the sentencing jury knew that Petitioner had already been convicted of first-degree murder, trial

counsel relied upon this innocence theory at sentencing.  This defense theory was a spectacular

failure.

98.    Had the sentencing jury heard that age may be considered as a mitigating

circumstance and that Petitioner's age at the time of the crime indicates his brain was not fully

formed in a way that is constitutionally relevant to culpability, there is a reasonable probability

the jury would have accorded significant weight to that mitigating circumstance and

recommended a sentence of life without parole.[24]

99.    Trial counsel was constitutionally ineffective for failure to develop and present Petitioner's age as a mitigating circumstance.  Appellate counsel was ineffective for failing to raise this issue on appeal.  Petitioner is entitled to relief from his sentence of death.

**X.    PETITIONER'S DEATH SENTENCE IS UNCONSTITUTIONAL UNDER THE 5TH, 6TH, 8TH AND 14TH AMENDMENTS, DUE TO INFIRMITIES IN THE SENTENCING PROCEDURE IN HIS CASE.**

100.    The Constitution requires that at a capital sentencing proceeding, any fact (other than prior conviction) that increases the maximum penalty must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.  Ring v. Arizona, 536 U.S. 584 (2002).

101.    In Delaware's capital sentencing scheme, the maximum sentence for first degree murder is life imprisonment unless two additional findings are made: that the State has proven the existence of an aggravating circumstance beyond a reasonable doubt, and that the aggravating factors (both statutory and non-statutory) outweigh the mitigating factors.  The two findings required for a sentence of death must be treated as elements of the offense and therefore must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

102.    Petitioner's death sentence is unconstitutional under Ring in numerous respects. First, the aggravating circumstances sought by the State were not charged through an indictment. This violates due process and the Fifth Amendment.

---

[24]In its sentencing opinion, the trial court noted the age of Petitioner.  Sentencing Opinion at 35; 40, Appendix.  Because of Delaware's sentencing scheme, there is no way to know if the jury considered age as a mitigating factor.  In any event, there is no question that the weighing processes by the jury and the court were skewed due to counsel's failure to present the compelling evidence outlined above regarding age as a mitigating circumstance.

36

103.    Second, the jury did not make the second finding (that aggravators outweighed mitigating circumstances) that permitted Mr. Stevenson to be sentenced to death. Rather, the jury, non-unanimously,[25] found that aggravating circumstances outweighed mitigating circumstances and <u>recommended</u> a sentence of death.[26] The trial judge considered the evidence, found that aggravating circumstances outweighed mitigating circumstances, and imposed a death sentence. This was error that denied Petitioner his constitutional rights to a trial by jury and a fair and reliable sentencing, as protected by the Sixth, Eighth, and Fourteenth Amendments.

104.    Third, the sentence is unconstitutional because, without a jury finding, the trial judge relied upon non-statutory aggravating circumstances in his Sentencing Decision. The jury was not required to list non-statutory aggravating circumstances on the verdict sheet. Thus, the jury did not make an express, advisory finding of non-statutory aggravating circumstances for the trial court to consider. Without guidance from the jury, the trial court "found" non-statutory aggravating circumstances and relied upon them in the weighing decision.[27]

---

[25]Two jurors did not find that the aggravating circumstances outweighed the mitigating circumstances.

[26]The jury's weighing determination was also unconstitutionally distorted by improper jury instructions. <u>See</u> Claims VII and XV.

[27]The trial court (<u>see</u> <u>State v. Stevenson</u>, Sentencing Decision (Del. Super. Feb. 3, 2006), Appendix) stated that it found four non-statutory aggravating factors that apply to both defendants, but enumerated only three factors (victim impact, Sentencing Decision at 23-24; Heath was an innocent victim, Sentencing Decision at 24; and Heath was unarmed and defenseless, <u>Id.</u>). The fourth factor relied upon by the court is unknown. In addition, the court found at least one non-statutory aggravating circumstance that applied to Stevenson alone: Parminder Chona was an additional target for harm. Sentencing Decision at 25. The Sentencing Decision notes, without specifying its finding, the additional non-statutory aggravating circumstances proposed by the State: Stevenson stole $4500 in gift certificates from Macy's; Stevenson said he committed the thefts because he owed money to a Philadelphia gang; Stevenson's disciplinary record in prison; and Stevenson "valued Heath's life as less significant than a blemish on his criminal record," Sentencing Decision at 26-27. Again, it

37

105.    Fourth, regardless of whether the weighing of aggravating and mitigating circumstances is done by the jury or by the judge, Ring requires the finding that aggravating circumstances outweigh mitigating circumstances to be made beyond a reasonable doubt.  In this case, the trial court instructed the jury to make the weighing determination by a preponderance of the evidence, NT 12/5/05 at 142-43.  The jury, by a vote of 10-2, determined that aggravating circumstances outweighed mitigating circumstances by a preponderance of the evidence. NT 12/6/05 at 12.  The trial court later imposed a sentence of death, finding, by a preponderance of the evidence, that aggravating circumstances outweighed mitigating circumstances. Sentencing Decision at 43.  Because this finding, necessary to imposition of the death sentence, was not made beyond a reasonable doubt, Petitioner's death sentence must be vacated.

106.    Petitioner's capital sentence was obtained through constitutionally infirm procedures.  In addition, trial counsel's failure to raise objections to these errors was deficient performance, prejudicing the outcome of Petitioner's capital sentencing trial.  Appellate counsel was ineffective for failing to raise these issues on direct appeal.  Petitioner's death sentence must be vacated.

## XI.    THE DEATH PENALTY IS UNCONSTITUTIONAL, FACIALLY AND AS APPLIED, BECAUSE THE STATUTORY SCHEME FAILS TO GENUINELY NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY IN VIOLATION OF DUE PROCESS AND THE EIGHTH AMENDMENT.

107.    The Eighth and Fourteenth Amendments require any statutory scheme authorizing the death penalty be tailored to minimize arbitrary and capricious imposition of that sanction.

---

is unclear whether the trial court relied upon these non-statutory aggravating circumstances in its decision and/or what weight it gave them.  It is also unknown whether the jury found these non-statutory aggravating factors or what weight it gave them.

<u>Furman v. Georgia</u>, 408 U.S. 238 (1972). The Delaware death penalty statute is unconstitutional, facially and as applied to Petitioner, for its failure to comply with this constitutional requirement.

108.    First, Delaware's death penalty statute has twenty-two aggravating factors – more than any other state except Utah. 11 Del. Code § 4209(e)(a-v). The statutory aggravating factors are so numerous, broadly drafted, and expansively interpreted that the statutory scheme fails to genuinely narrow the class of persons eligible for the death penalty in violation of the cruel and unusual punishment and due process provisions of the United States and Delaware Constitutions.

109.    Statutory aggravating factors will not function to eliminate arbitrariness and caprice if a significant majority of those charged with first degree murder are "death-eligible." Under such circumstances there is no longer any meaningful distinction between those who are eligible for death and those who are not. With very few exceptions the Delaware Supreme Court has interpreted the twenty-two aggravating factors broadly and has not limited their scope.

110.    The Delaware death penalty statute is also unconstitutionally vague. First, the statute permits the sentencing jury and the sentencing judge to consider non-statutory aggravating factors, without requiring proof beyond a reasonable doubt, jury unanimity, or an express jury finding of the non-statutory aggravating factors. 11 Del. C. §4209(c)(1). Thus, the jurors are allowed, indeed in this case they were instructed, <u>see</u> NT 12/5/05 at 139, to consider aggravating factors which remain unknown and unspecified to the trial court and to the defendant. The trial court, in its final determination of sentence, considers non-statutory aggravating factors without guidance from the jury as to its findings. In this case, the trial court relied substantially on non-statutory aggravating factors in its sentencing decision. <u>See</u> Sentencing Decision at 23-27.

111.    The statute's treatment of mitigating circumstances is so vague that the importance of mitigation is entirely discounted.  Mitigating circumstances are not enumerated in the statute, although aggravating circumstances are statutorily enumerated.  See 11 Del. C. §4209.  The sentencing jury is not required to record its findings as to mitigating circumstances, 11 Del. C. §4209(c)(3), giving the sentencing judge no guidance in finding or weighing the mitigating circumstances.

112.    The Delaware statute's overbroad aggravating factors, the vague treatment of non-statutory aggravating factors, and the vague treatment of mitigating factors, individually and in combination, increase the possibility of arbitrary and capricious imposition of the death penalty. The statute should be declared unconstitutional.  Petitioner's death sentence must be vacated.

113.    Prior counsel was ineffective at trial and on appeal for failing to raise the constitutionality of this statute.  Petitioner was prejudiced by counsel's failure to do so.

## XII.    PETITIONER IS ENTITLED TO RELIEF BECAUSE TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE OF HIS CAPITAL TRIAL.

114.    In support of this claim, Petitioner alleges the following facts, in addition to those that will be presented after a full investigation, discovery, access to this court's subpoena power and an evidentiary hearing.

### A.    Counsel Failed to Develop and Present Crucial, Available Life History and Mental Health Evidence In Mitigation of Punishment in This Capital Case.

115.    Petitioner's penalty phase retrial took place in the fall of 2005.  Counsel had available to them the record of the first penalty phase proceeding, some nine years earlier.  At that proceeding, the defense called a total of fifteen (15) witnesses, including Petitioner's friends, Kevin Powlette, Nathaniel Himmons, and Kerri Parise: a teacher (Ronald Montgomery) and

40

basketball coach (Frank Greco) from Central High School; a supervisor (Anna Hawley) from the University of Delaware Library; a corrections officer (Stuart Freeman) from the Delaware Department of Correction; and several relatives: Daryl, Lavale and George Stevenson (cousins), Shirley Stevenson, Petitioner's great-aunt, Novella Brown, his grandmother, Elissa Brown, his sister, Latitia Bumpers, his aunt, and Delphine Brown, his mother.  NT 11/14/96 at 92-162.   The theme of that proceeding was that David Stevenson was a good friend, employee, student, cousin, brother, grandson and son.  It obviously failed to convince the jury that a sentence less than death was appropriate.

116.    Professionally reasonable counsel would have realized that simply repeating the presentation made at the first proceeding was highly unlikely to produce a different result.  In fact, retrial counsel apparently realized that fact, for they retained an expert psychologist, Dr. Edward J. Dougherty, to testify at the retrial.  Despite having retained Dr. Dougherty, however, counsel never undertook an independent investigation of Mr. Stevenson's social history, and never provided the results of such an investigation to Dr. Dougherty.  As a consequence of counsel's inadequate preparation, Dr. Dougherty knew virtually nothing about Petitioner's actual history of family abuse and dysfunction, and neither did the jury.

117.    In order to adequately investigate and develop mitigating evidence for capital sentencing, capital counsel should develop a social history of the client; use that social history to develop and prepare mitigating evidence; and then make reasoned decisions about what mitigation to present.   In this case, however, trial counsel did not develop a social history, and did not prepare or present the valuable mitigating evidence that Petitioner's social history reveals.

118.    Record-gathering, thorough witness investigation and working closely with

41

experts, is critical to the development of an appropriate social history, and thus for the

development of mitigation.  Regrettably, counsel confined their records "gathering" to culling the

meager records obtained by prior counsel in preparation for the initial trial.  Even the most

rudimentary records – such as hospital records from Petitioner's critical early childhood years –

were neither sought nor obtained.  Counsel failed to hire a mitigation investigator or otherwise

undertake the thorough investigation and preparation necessary to provide the jury with an

accurate picture of Petitioner's life.  Had counsel developed and presented the compelling

available mitigation, it is reasonably likely that the jury would not have sentenced Petitioner to

death.

    **B.**      **Readily Available Mitigating Evidence that Counsel Could and Should have Developed and Presented**:  **The Social History.**

    119.    Counsel should have worked diligently to compile Petitioner's life history in an

effort to present the information contained therein to the jury that sentenced him to death.  Had

the jury been given the true picture of Petitioner's life, it is reasonably likely that it would not

have recommended a death sentence for Mr. Stevenson.  An accurate social history includes, and

would have included at the time of trial, the following information developed by Petitioner's

current counsel.  Had counsel obtained the records that current counsel have found, trial counsel

would have been able to present a compelling picture of profound abuse, repeated abandonment

and severe neglect, which should have been presented in detail to Petitioner's jury.  Undersigned

counsel have begun to prepare a social history, which is inserted below. Had the jury had the

following information, it is reasonably likely that it would have returned a sentence less than

death:

## Social History: David Stevenson

I am an investigator with the Federal Community Defender Office, Capital Habeas Unit. I am a licensed social worker, and have experience with the mental health impacts of trauma upon those who suffer it. I also have extensive experience in generating social histories as both a social worker and capital investigator. All of the opinions expressed herein are stated to a reasonable degree of professional certainty, and all facts are true to the best of my knowledge and recollection.

David Stevenson was born June 6th, 1974, in Philadelphia, Pennsylvania. He was the oldest of two children born to Delphine Brown, nee Stevenson. His birth certificate lists his father as a David Jones. David Jones left Delphine before David was born. David's mother had gotten pregnant with him when she was just sixteen years old. She delivered him at seventeen.

On July 26, 1976, when David was two years old, his mother gave birth to a daughter, David's half-sister, Elissa (Lisa) Lewis nee Brown. His mother married Elissa's father, Elwood Brown, that same year.

David's family was extremely dysfunctional. He never knew his birth father and his stepfather, Elwood Brown, was an abuser, a drug addict, and a drunk. He abused and neglected Delphine, David and Elissa. He provided no financial support to Delphine or the children. Delphine was very young and immature, and came from a very dysfunctional upbringing herself. She ended up in abusive relationship after abusive relationship. She was absent from her children's lives for extended periods of time, leaving them to be cared for by other relatives.

David lacked a stable living environment for virtually all of his infancy, childhood and adolescence. For years Lisa and David were separated; one living with one grandmother and the other living with another. Delphine particularly desired to whisk Elissa out of the house to live, and did so, each time another of Delphine's boyfriends came along. Sexually abused herself, Delphine feared for Elissa's welfare, and sent Elissa off to live with Elissa's paternal grandmother, Novella Brown, when she entered a new relationship. David's caregiver in these situations was Irene Stevenson, his maternal grandmother. She, too, was an alcoholic, and her house was a place of constant turbulence and chaos. Even though David was just a little boy who required consistent, individualized attention–particularly since he was cast off by his mother-- his grandmother had troubled teenage and young adult children living in the home as well. They were quick to anger and often settled their disputes with violence. The police were regularly called to the house. It was no place for a little boy to grow up.

43

## Family Background

Petitioner's mother, Delphine Brown, was the oldest of seven children born to Irene Stevenson. Irene Stevenson never married and her seven children were fathered by several different men. Delphine never knew her own father, and none of her siblings' fathers ever participated in their upbringing. Delphine was born on November 3rd, 1957, followed by siblings Dexter (8/4/1959), Verna (6/26/1960), Cleveland (2/12/1962), Vernon (9/25/1963), Iona (7/26/1964), and Letitia (12/19/1965).

Irene Stevenson had a boyfriend named Jerry Wright. Although he was physically abusive to her and she was physically abusive to him, the two of them stayed together for over twenty years.

The family lived in the projects on 46th & Fairmont in the city of Philadelphia. The projects were horrific and fraught with unspeakable violence. The street the family lived on was nicknamed "Murder Street." Many of the residents of the projects were addicted to some substance and this led to fights, shootings and stabbings. People were mugged on a daily basis. There was also pervasive gang activity, which led to gang wars. The projects were freezing cold in the winter and sweltering in the summer, and were filled with rats and roaches.

Irene Stevenson was neglectful to her children, including Delphine. In Delphine's school records, almost all of her absences are attributed to parental neglect. Irene's children report that she was generally busy with her various boyfriends and had little time for them. Delphine was left to care for her younger brothers and sisters in her mother's absence; with no one to mother *her* or to safeguard her welfare. Delphine's school records indicate that she had eye problems that went untreated.

Cleveland and Delphine recall that the family often had little food to eat and they rarely had proper clothes. Delphine's school records confirm that she did not attend school because she did not have proper shoes. See school records, Appendix. Each item of clothing was handed down from one child to the next and the children often had holes in the soles of their shoes. Because they were so poor, the children had to go to school with clothes that were tattered and torn. They received public assistance for school through the reduced lunch program. In 1971, their family income was only $5,376 for eight individuals.

Delphine's school records indicate that the family was also dispossessed from their home, and that they struggled to find a new place to live. Records also indicate that they had to leave one apartment because of a fire.

44

School records indicate that Delphine was a quarrelsome, disobedient and overbearing child, and that she lacked self control. One teacher noted that she was constantly at odds with the other children. Her grades are poor, and she was noted to be untidy. Teacher after teacher reported problems with her behavior, and noted that her behavior had to improve.

One of David's aunts, Iona Stevenson, was arrested and incarcerated on drug charges (possession of crack cocaine), in Philadelphia in 1999– a point at which she had been addicted to drugs for many years. Records gathering continues with respect to his other aunts and uncles.

### David's Birth and Early Childhood

Delphine recalls that David weighed only 5 pounds when he was born. Delphine was only seventeen when she had David, and had to leave school to care for him. The father of her child was not present for the pregnancy or birth, and David never knew him. David's aunt Iona recalls that David always wanted to know his father and it upset him greatly that he never knew who he was.

Delphine was ill-prepared to become a mother at such a young age. Not in a financial position to care for a child on her own, she depended on her alcoholic mother and her younger siblings to help care for David. As a result, it was impossible for David to bond and attach with anyone, because his care givers were so numerous and had all manner of problems of their own, and his mother was not equipped to deal with an infant. These factors combined to impact negatively on David's early development. When an infant's basic needs are not met, he quickly he learns that the world is a scary place and that adults cannot be trusted. He quickly learns– just as David did-- that he must care for himself.

Hospital records from David's infancy and early childhood are replete with problems of adequate nourishment, appropriate feeding, and overall care. At only *five weeks*, he was brought to the emergency room at Philadelphia Children's Hospital for a bladder infection and a cough. Nursing notes indicate that his young mother "desires a pill to take cough away. Told her we could not give any medicine as baby is too young." Instead, the hospital staff tried to "counsel[] parents about feeding habits," but found that they "were resistant and stated that grandmother was one who actually takes care of child."[28]

The problems with nourishment and care persisted, and David was often treated at local emergency rooms– common places for treatment for those living at the poverty line, as David was. At *three months*, David was brought to the

_____

[28] See, CHOP records, Appendix.

45

emergency room for diarrhea, nasal congestion and heat rash. Nursing notes indicate that the infant's mother was known to them from her trips to Philadelphia General Hospital.

At 4-5 months of age, David was hospitalized for an entire week with gastritis, an inflammation of the thick mucous lining of the stomach that often causes nausea, vomiting and severe pain. About a year later, he was also brought to the hospital– this time for a viral upper respiratory infection. At eighteen months, he was brought to the hospital yet again. This time, his mother reported that he was "breath[ing] funny." During this visit, hospital staff noted that David's skull had previously been fractured. Family members report that this fracture occurred when David tumbled down a series of about fifteen high stairs while living with his grandmother on Greenway Street in Southwest Philadelphia: his uncle, Dexter, had reportedly dropped him down the steps. David blacked out. Relatives who recall the incident report that they dealt with this injury by shaking David, but that he was unresponsive. They then took him to the hospital where he was diagnosed with head trauma. At the time he was seen at the hospital, the eighteen month-old David knew only three words: "mom," "stop," and "no."[29]

Delphine reported to hospital staff that David had terrible temper tantrums and held his breath until he turned blue. Approximately six months after being dropped down the stairs, David was again brought to the hospital, this time for extraction of a Q-tip that was protruding from his ear, causing irritation and bleeding. He was diagnosed with traumatic external otitis. The cause of this injury is not known.

It was around this time that Delphine met and married Elwood Brown, the father of David's sister Elissa (Lisa). Elwood, Delphine, David and Lisa lived in a house on Greenway Street that was close to both Delphine's family and Elwood's family. As a result, David spent a great deal of time with his maternal grandmother and his stepfather's mother, Novella Brown. The relationship between Elwood and Delphine turned extremely violent. Elwood smoked pot and used crack. When he married Delphine he tried to hold various jobs as a salesman but the deeper he got into drugs, the less he worked, until he could not work at all. Friends of Elwood report that he was a nice young man until he started using drugs. The drugs, they say, turned him into a completely different person– one who was hostile, impossible to reason with, and abusive.

In addition to a plethora of illnesses, an acute head injury and fracture, and other injuries, David was extremely pigeon-toed as a young child. According to family reports, Delphine took David to a doctor when he was approximately 4 years

---

[29] See CHOP records, Appendix.

old, and the doctor broke David's legs and put them in casts, requiring David to be carried around.  Prior to the operation David had a very difficult time doing anything, and he was unable to run.  He also had asthma.  He frequently woke up in the middle of the night with severe nosebleeds.  He became a loner who kept to himself most of the time.

Delphine worked at Delaware County Hospital to support the family in the laundry department.   It was very difficult for Delphine to pay the bills, and the family's electricity was turned off at least once, requiring her to ask her mother-in-law Novella to pay to get it turned back on.  There were a number of other times that Novella had to help them pay their bills. Delphine was on welfare and food stamps because the family had so little money.

During this time Elwood begged Delphine for money so he could get drugs, and if she didn't give him any, he beat her.  According to family reports, it was not uncommon for Elwood to come in from one of his drug binges and scream, curse at, and threaten Delphine, while Lisa and David cowered in the corner.

An individual close to the family reports that Elwood confessed that he also beat David and Lisa. Elwood said he did  not remember the beatings, but when he sobered up, he saw that Delphine, David and Elissa had bruises and cuts all over their bodies,  so he knew that he had beaten them.  One particular incident of abuse is recalled by former Philadelphia Mayor Wilson Goode, who attended the same church as the Browns.  Mayor Goode recalled an incident in which Elwood yanked David by the arm so severely that Goode felt the need to intercede on David's behalf. Mayor Goode admonished Elwood that was no way to treat a child.  Elwood told the mayor to mind his own business.

Family members report that they often saw Delphine with bruises, cuts and scrapes.  After a beating, Delphine often called her brothers and mother, who rushed over many times only to find blood not only on Delphine but all over the premises and walls. Cleveland recalls one incident in which Delphine "was all cut up" from a knife that Elwood used.  By the time the family members arrived to help Delphine, Elwood was usually gone, and Delphine was left behind, shaking, while David and Elissa were alone, often off in a corner by themselves. Furniture was overturned. Everything was out of order.

Not surprisingly, it was difficult for Delphine to move after one of Elwood's beatings.  She recalls being stiff for days.  Delphine recalls being grabbed, snatched and dragged by her limbs and her clothing. It was not unusual for Elwood to tear her clothing from her body.  Delphine's brothers, Vernon and Cleveland, often tried to intervene with Elwood after the fact, but it was to no avail: Elwood blamed Delphine for his beatings, arguing that she had instigated them.

Cleveland recalls going to Delphine's house after a beating and seeing David curled up in a ball, crying and shaking, because he was so scared. Cleveland and Irene tried to get David out of the house, but he didn't want to move from the spot.

Sometimes Delphine ran out of the house to get a neighbor to call police and the children were left alone in the house with Elwood. When he left they would be alone, unattended and upset from the incident.  Other times Elwood trapped Delphine in the house and would tear the phone out of the wall so she could not call anyone for help. Sometimes when he blocked her way the children would get in the way. She remembers the children being terrified.

After the beatings Delphine occasionally left the house with the kids for a day or two, but she always went back.  Delphine was dependent on Elwood in every way. At the time, she did not drive and relied on Elwood for transportation.

During the preschool years, children turn to their parents for protection and stability, but these needs are often disrupted in families with partner abuse. David had no one to comfort him when his mother was being beaten.  Children in this age group who have witnessed domestic violence also may show signs of terror, manifested by yelling, irritability, hiding, and stuttering. When David was young he stuttered terribly. His stuttering was so severe that he had to get speech therapy when he entered school. The family recalls that it used to take him forever to get out a few words. He also had a facial twitch that seemed to get worse as he aged.

**Early School Information**

While David's home life was in a constant state of  upheaval, his overall stability was further compromised because he had to attend different schools.   In 1977,  David entered First Baptist Preschool in Philadelphia.  He then went to Catharine school until approximately March of 1984.  In 1981, a teacher noted that David had trouble getting along with other children.  His mother reported that he had the mumps that same year. See School Records, Appendix. By the age of nine, his depression was apparent even to those who failed to identify its cause: one  teacher commented that life could be better in school if David "cheered up." She went on to say he had no kind words to say, and had an "attitude" and a "fresh mouth."  Id.

During this time period David was witnessing severe domestic violence at home, which had great (negative) effects.  Witnessing abuse can lead to very serious psychological trauma with long-term effects, affecting not only the child's well-being during or shortly after the abuse, but also the child's ability to build and maintain healthy relationships in adulthood.   When children witness domestic violence, aggression, hostility, anxiety, social withdrawal and depression are commonly seen. Witnessing partner abuse can undermine a child's sense of self-esteem and their

48

confidence in the future. School-aged children also are more likely to experience guilt and shame about the abuse, and they tend to blame themselves. This could be one of the reasons David is described as so quiet as a child. It is noted by several family members that David was a loner, and teachers noted the hostility often seen in children who witness abuse.

When David was about six or seven years old, the family lived with Shirley Stevenson, Delphine's aunt.  Delphine also recalls that she took the kids to various friends' houses for overnight visits on many occasions to escape the abuse.   This back and forth movement and lack of stability went on for approximately eight years. When Delphine and Elwood finally separated, Lisa went to live with Novella and David went to live with Irene. This was very difficult for the children because not only did they lose their home, but they lost each other, and were shipped to different grandparents.  Delphine never received any child support from Elwood after the separation.  She reports that it was always a struggle for her to clothe and feed the kids.

In 1983, David was in the third grade. School records indicate that Delphine brought David in to school late on seventeen occasions.  During one week, David was late four times in a row, and Delphine told the school that she overslept.  Clearly, David's home life was chaotic.  His mother was not even able to perform the simple task of getting her son to school on time.

Lisa was sent to grandmother Novella, who arranged counseling for Lisa. David, on the other hand, had no such advantages: he was left with grandmother Irene, his maternal grandmother, who was an alcoholic. Irene's house was very chaotic because many of her children still lived there, and David's uncles were all fighters and drinkers.  Novella recalls one of David's uncles smashing in the car windows of someone who had made his mother angry.  During this time Delphine was not caring for her children at all, and Elwood, the only father David ever knew, was absent because of his severe drug addiction.

Novella describes Delphine as being very "hot and cold" with people, in that Delphine either loved or hated the person with no in-between.  Delphine could be very happy one second and very angry the next second.   This type of instability can be very difficult for a child, because the child is not sure who he is permitted to "like" from day to day.

In April of 1984, when David was ten years old,  Delphine moved the children to Glenolden, Pennsylvania. David and Lisa attended Glenolden Elementary school and they lived in an apartment not far from the school. This area was predominantly white and David was teased for being the only black child in his grade.

### William Tabb

When David was approximately eleven years old, Delphine moved the family to Upper Darby in Pennsylvania. David entered Beverly Hills Middle School in Upper Darby in 1986. During that time, Delphine met a man named William Tabb and he subsequently moved in with the family that same year. From the beginning Tabb was extremely violent, and isolated Delphine from all her family and friends. He was filled with rage and was extremely jealous. Tabb was also a heavy drinker who routinely attempted to hide his alcohol consumption, stashing whiskey bottles all over the apartment and in his clothes.

Tabb frequently choked Delphine. He also tied her to the bed at night so she could not get away. He threatened to kill her and chased her with knives. Delphine recalls one incident in which Tabb held a knife to her throat and threatened to kill her. She somehow made it out of the apartment and ran outside, shoeless, to call the police to help her.

Sometimes David tried to intervene, but he was too young to fight a grown man. Tabb shoved David and twisted his limbs when he attempted to help his mother. David pleaded with Delphine to leave Tabb and admonished her to stop getting into relationships like this. He was angry at Delphine for allowing this to happen and he was terrified of Tabb. It should be noted that it is very typical for children who witness domestic violence to get angry with the victim, because the child suffers at the hands of the abuser as well. Such was the case here.

Delphine constantly had bruises and scratches all over her body from the beating she sustained. Tabb also regularly bit Delphine's flesh: to this day, Delphine has scars on her back from Tabb's bite wounds. One night Tabb beat Delphine so badly that one of the neighbors called the police, and David was awakened by a police officer shining a light in his face. When he got out of his bed he saw blood all over the walls. His mother was so badly beaten that she had to be taken to the hospital. The doctor who attended her advised her never to return to the man who did that to her, and told her that she was lucky even to be alive.

After Delphine left Tabb, he stalked her at her job and slashed the tires on her car. Tragically, his violence only escalated. On July 7, 1986, Tabb was arrested for aggravated assault, robbery, kidnaping, recklessly endangering another person and false imprisonment when he showed up at Delphine's place of employment and forced her into a car. Tabb produced a butcher knife and told Delphine not to scream. When she did scream he threatened to kill her, and dragged her out of the car to her apartment. The case went to court in Delaware County, and Tabb received 18 months probation and was fined. David was twelve years old at this time.

The family lived in Upper Darby until approximately June of 1987, when they moved back to Philadelphia. David attended Pepper Middle School in Philadelphia in the Fall, but he continued to miss school. In December of that year, a teacher contacted David's mother regarding his absences. School records from that period of time attribute at least fifteen of David's absences to parental neglect. A year later, in 1988, David entered the gifted program at Pepper but failed to do his research project. That same year, one of David's teachers contacted Delphine regarding David's behavior, and later contacted her two more times regarding his absences.

Adolescent witnesses of domestic violence have higher rates of interpersonal problems with other family members, especially interparental conflict. They are more likely to have a fatalistic view of the future resulting in an increased rate of risk-taking and irresponsible behaviors, such as school truancy, early sexual activity, substance abuse, and delinquency. The school records during this time period note that David did not appear to "try" at school, which is yet another indicator that he was witnessing abuse in the home.

David attended Central High School in Philadelphia. He entered the school in 1988 and graduated in 1992. At one point in 1991, David and his cousin George were robbed at gunpoint, leading Delphine to conclude that the neighborhood was becoming very unsafe. Delphine promptly moved to Delaware, but left David behind to live with her cousin, Darryl Stevenson, so David could finish his senior year at Central.

### Adulthood

David received a basketball scholarship to Lebanon Valley College and attended for a semester in 1992, eventually moving back to Delaware to live with his mother and sister. David entered Delaware Tech in 1993, and attended there until he was accepted to the University of Delaware in June of 1995. In 1994, his girlfriend, Kim Tolerson, gave birth to a female child, Traychelle Tolerson. Kim told David that Traychelle was his daughter, so David took care of the child as best he could, financially and otherwise. Subsequent paternity testing demonstrated that Traychelle was not David's child.

### Analysis and Impressions

Child witnesses to domestic violence often believe violence is an appropriate means of resolving conflict and an integral part of a close relationship. These children are at greater risk for internalized behaviors such as anxiety and depression, and for externalized behaviors such as fighting, bullying, lying, or cheating. They also are more disobedient at home and at school, and are more likely to have social competence problems, such as poor school performance and difficulty in

relationships with others. Child witnesses display inappropriate attitudes about violence as a means of resolving conflict and indicate a greater willingness to use violence themselves.

Children growing up in violent homes often take responsibility for the abuse and may feel guilty for not being able to stop it. They live with constant anxiety that another beating will occur, or that they will be abandoned.

Many other factors contributed to the adult David Stevenson such as his lack of attachment with his primary care giver. Attachment is all about building relationships. Humans need attachments with others for their psychological and emotional development as well as for their survival. Infants need to be physically close to the mother and be able to receive and give affection to form an enduring emotional bond. David did not have this because Delphine gave birth to him when she was so young and unprepared to deal with him. She did not have a functional family that could assist her and the father of David was not around.

The unique and exclusive relationship between a mother and child colors the child's relationships for rest of his life. If the relationship is close and secure, then the child learns to trust and love. If the relationship is emotionally distant and inconsistent, then the child learns to distrust and believes that one is all alone in the world. Attachment develops through repeatedly being looked after and appropriately responded to by the caregiver. This convinces the baby and young child that a person is available to soothe, console and comfort him in time of distress. David did not have this experience of safety which led him to believe that people are uncaring and cannot be trusted.

When Delphine was physically present in David's life she was being beaten by her husband and her moods as described by Novella were inconsistent. Children seek proximity to a specified attachment figure in situations of alarm or distress, for the purpose of survival. When Delphine was being beaten David was terrified and unable to be close to his mother. This had an indelible, negative impact on his development.

Declaration of Kathleen Kaib, MSS, MLSP, LSW, Appendix. Counsel failed to present this compelling mitigation evidence, either at the first or the second penalty phases.

120.    Effective counsel would have developed and presented expert testimony about the lasting, adverse mental and emotional effects of Petitioner's traumatic life history. Because counsel had not developed a social history, no one was able to testify about the problems a life

history such as Petitioner's causes.  If counsel had developed a social history, which effective

counsel would have done, Petitioner would have been able to provide expert testimony about the

mental and emotional significance of that life history to his capital jury.

121.    Because counsel had not thoroughly prepared themselves in the area of mental

health, the jury received the opposite, and factually erroneous, impression -- that Petitioner

suffered no emotional, physical or psychological trauma, that his upbringing was healthy and that

life was good.  Indeed, this erroneous impression is borne out by the findings of the sentencing

Judge:

> [Mr. Stevenson] had good enough credentials to be admitted into the academically
> challenging and competitive Central High School.  He does well in math.  He held
> jobs, including one while a student at the University of Delaware.  He had a
> strong, loving mother who kept him from hanging out on corners, etc.

Sentencing Decision (2/3/06) at 40-41.  This is a very different picture than that painted by the

social history outlined above.

122.    Counsel's deficient performance was not the result of any tactical or strategic

choice within the range of reasonable competence.  Instead, it was the result of counsel's lack of

preparation.   It is reasonably probable that, if counsel had performed with reasonable

effectiveness throughout the preparation for, and during, the penalty  proceedings, Petitioner

would not have been sentenced to death.

## XIII.  PETITIONER WAS DENIED A FAIR PENALTY HEARING BEFORE AN IMPARTIAL TRIBUNAL DUE TO THE RE-SENTENCING COURT'S DENIAL OF HIS MOTION FOR RECUSAL IN VIOLATION OF DUE PROCESS AND THE EIGHTH AMENDMENT.

123.    As laid out in greater detail in the Procedural History, supra., during state post

conviction proceedings, Petitioner's case was remanded by the Delaware Supreme Court.  The

court ordered a new penalty hearing, and directed that the guilt phase claims raised in post conviction be considered by a new judge. Stevenson v. State, 782 A.2d 249 (Del. 2001). Judge Herlihy was assigned to the case. Judge Herlihy denied Petitioner's remaining post conviction claims and also determined that, in spite of the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584 (2002), a new penalty hearing could be held. The court issued a lengthy memorandum opinion addressing these issues. See State v. Manley, State v. Stevenson, Del. Super., Nos. IN95-11-1047-1049, IN95-12-0687-0689, Herlihy, J. (October 2, 2003), Appendix.

124.    In his opinion, Judge Herlihy, who ultimately sentenced Petitioner to death, tipped his hand regarding the evidence and his predisposition against Petitioner. For example, the court stated that the "evidence conclusively showed a planned and intentional killing in which two persons, these defendants, participated." Id. at 44. This is particularly telling since one of the aggravating circumstances, upon which Judge Herlihy sentenced Petitioner to death, was that the killing was premeditated and the result of substantial planning. Clearly, the sentencing court had made up its mind regarding the existence of this circumstance prior to the 2005 sentencing hearing.

125.    The court also pointed out that "[t]he evidence was overwhelming" against Petitioner, id. at 72, and stated that there was "no credible evidence that the death of Heath was the unintended consequence of the defendant's action." Id. at 43. Finally, in reviewing the prior proceeding, the court stated that "the jury unanimously found beyond a reasonable doubt that four statutory aggravating factors existed." Id. at 80.

126.    These findings by Petitioner's ultimate sentencing judge, clearly show a

predisposition regarding the facts and the existence of aggravating circumstances and exhibit a bias against Petitioner. The Due Process Clause incorporates Petitioner's right to have his case decided by an impartial judge. This is particularly so considering Delaware's sentencing scheme, which gives that judge the full authority over the question of life or death. Here, the court had prejudged the facts and the Petitioner. This lack of impartiality ultimately ended in an unfair and unconstitutional sentence of death. This argument is only strengthened by all of the penalty phase errors outlined in great detail in this Petition. Petitioner hereby incorporates by reference all such claims, and contends that the number and serious nature of errors committed by the court, further evidence the court's bias.

127.    The lack of an impartial tribunal in this capital case was *per se* prejudicial, and no showing of specific prejudice is required. In the alternative, the State cannot show that the court's bias did not substantially and injuriously affect or influence the jury's recommendation and the judge's ultimate decision to put Petitioner to death. This bias affected the process to such an extent as to render petitioner's sentence fundamentally unfair and unconstitutional. The error resulted in violations of Petitioner's constitutional rights.

128.    Prior counsel raised this claim before the 2005 sentencing proceedings. The trial court denied the motion. Counsel failed to raise this meritorious issue on appeal. Failure to do so amounted to ineffective assistance of counsel. Counsel's performance was deficient. Indeed, counsel raised only two issues in this capital appeal. The argument section of the appellate brief is a total of nine pages. Certainly, there can be no strategic reasons to fail to raise such a meritorious claim. Petitioner was prejudiced as he was sentenced to death by the very judge whose recusal was warranted.

55

**XIV. PETITIONER'S RIGHT TO A FAIR SENTENCING AND HIS EIGHTH AMENDMENT RIGHT TO INDIVIDUALIZED CONSIDERATION OF AGGRAVATION AND MITIGATION WERE VIOLATED BY THE JOINDER OF HIS PENALTY PHASE HEARING WITH THAT OF THE CO-DEFENDANT.**

129.    As argued elsewhere in this Petition, the state court erred in failing to grant severance of this joint trial.  See Claim II.  It is even more clear that such antagonism made the penalty phase unfair and unconstitutional.  Capital defendants have a constitutional right to individualized sentencing.  In the context of this case, mitigation on behalf of Manley necessarily resulted in aggravation for the Petitioner, aggravating factors that would otherwise have not been admitted.  Petitioner's right to individualized sentencing was violated by the joinder of these sentencing hearings.

130.    The United States Supreme Court has repeatedly held that individualized consideration of a defendant's arguments for being spared the death penalty is a central requirement of a constitutional capital sentencing procedure.  The requirement of such individualized consideration is rooted in the unique finality of the death penalty, requiring a correspondingly reliable determination of the appropriateness of the penalty.  Such a determination cannot be based on a trial process that interjects irrelevant considerations into the fact finding process.  Here, because of the joint nature of the sentencing, such irrelevant considerations were injected in violation of the Eighth Amendment.

131.    For example, evidence was introduced through Petitioner's statement in the underlying theft case that he was involved with gang activity in Philadelphia.  See e.g. 11/16/05 at 45 (prosecutor's opening statement).  In itself, this evidence was highly prejudicial and violated due process.  However, when this evidence was considered with mitigation presented by

Manley, the damage was greatly increased. Manley presented evidence that, although he was

raised in the projects, in an area with much gang activity, he was never involved in such activity.

See e.g. NT 11/29/05 at 53, 56. The natural inclination of the jury, at that point, would be to

draw negative inferences toward Petitioner in this regard. Additionally, Manley's theory of

mitigation was that he was a good person with no criminal record, id. at 80, with a positive

military record, NT 11/30/05 at 55, and who was gentle with children, id. at 50. Again, the

introduction of such mitigating evidence on behalf of Manley necessarily tended to aggravate

Petitioner's case, by comparisons with Manley. Unlike Manley, Petitioner had a criminal record,

although it was limited to the underlying theft, and was never a member of the military.

132.    Also highly prejudicial to Petitioner's sentencing case was the fact that the

Manley exercised his right to allocution, whereas Petitioner did not. In his allocution, Manley

stated that he did not shoot the victim. NT 12/5/05 at 62. The only inference to be drawn from

that statement was that it was Petitioner who shot the victim. That was highly prejudicial, as

Manley's allocution would not have been admitted if Petitioner had been afforded an individual

penalty hearing. Moreover, the fact that the Petitioner declined to allocute when Manley did

created a powerful negative inference.

133.    Individualized sentencing is crucial for compliance with Eighth Amendment

narrowing requirements. Here, the joinder of penalty phases resulted in an arbitrary and

capricious sentence of death. Prior counsel were ineffective for failing to fully litigate the

severance of the sentencing hearings at the trial level and for failing to raise this issue on appeal.

57

**XV.    PETITIONER'S RIGHT TO A FAIR SENTENCING HEARING WAS VIOLATED BY THE COURT'S ERRONEOUS INSTRUCTION REGARDING REASONABLE DOUBT, IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

134.    The court's instruction to Petitioner's sentencing jury regarding the application of reasonable doubt was confusing, failed to properly define reasonable doubt and effectively lessened the State's burden of proof.  The court addressed the jury as follows:

> As I just mentioned, the State has the burden of proving beyond a reasonable doubt all of the elements of any statutory aggravating circumstance it claims exists in this case as applicable to a particular defendant.  Reasonable doubt is a practical standard.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the existence of a statutory aggravating circumstance.  Therefore based upon your conscientious consideration of the evidence, if you are firmly convinced as to a particular defendant of the existence of any of the four statutory aggravating circumstances which the State contends exists in this case, you should find that such circumstance has been proven beyond a reasonable doubt as to that defendant.  If, on the other hand, you think there's a real possibility or, in other words, a reasonable doubt about a particular statutory aggravating circumstance relating to a particular defendant, you must give the defendant the benefit of that doubt by finding that such statutory aggravating circumstance has not been proven as to that defendant.

NT 12/5/05 at 147-148.  This instruction fails to meet constitutional muster for several reasons.

135.    First, the court failed to properly define reasonable doubt for the jury.  The court instructed the jury that the standard of proof "beyond a reasonable doubt is proof that leaves you firmly convinced."  Id. at 148.  This instruction does not clearly define reasonable doubt.  Indeed, "firmly convinced" is a standard of proof by clear and convincing evidence, a lesser standard of proof than beyond a reasonable doubt.  As the Constitution requires that aggravating circumstances be proven beyond a reasonable doubt, the court's instruction lessened the State's burden in proven aggravating circumstances and violated the Eighth Amendment.  See also

58

Claim VII.

136.    Due process and the Sixth and Eighth Amendments require that the sentencing jury be properly instructed regarding reasonable doubt.  Petitioner's jury was never clearly instructed on this concept of reasonable doubt.  Instead, the jurors were merely instructed that if they were "firmly convinced," the evidence was sufficient to prove the aggravating circumstances.  It is reasonably likely that the jury understood that instruction as requiring something less than beyond a reasonable doubt.

137.    Additionally, the court's instruction regarding whether the State failed to meet its burden was also vague and confusing.  The court instructed the jurors that "if you think there's a real possibility or, in other words, a reasonable doubt about a particular statutory aggravating circumstance ..."  This instruction makes no sense and fails to properly outline the choices available to the jury.

138.    Counsel were ineffective for failing to object to these instructions, and for failing to raise this issue on appeal.  Counsel's performance was deficient as there can be no acceptable reason to fail to object to such erroneous instructions.  Petitioner was prejudiced by counsel's deficiencies as the jury was permitted to find statutory aggravating circumstances based on proof less than beyond a reasonable doubt.

**XVI.    PETITIONER'S RIGHT TO A FAIR SENTENCING PROCEEDING, AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS, WAS VIOLATED BY THE COURT'S INSTRUCTION TO THE SENTENCING JURY REGARDING ACCOMPLICE LIABILITY.**

139.    During the re-sentencing proceedings, the court read part of the instructions that had been given to the original jury in the guilt phase, to Petitioner's sentencing jury.  This section of the original charge outlined the accomplice liability instruction read to the first jury.  As

described elsewhere in this Petition, the recitation of this instruction was error in Petitioner's guilt phase. The re-iteration of this erroneous instruction to the penalty phase jury, upon re-sentencing, violated due process and Petitioner's right to a fair sentencing proceeding.

140.   After the court explained that this instruction was given to the jury that convicted Petitioner and the co-defendant, the court read this section of that charge to the sentencing jury: "However, there is no requirement that the jury be unanimous as to which of the parties was the principal and which was the accomplice as long as you are all agreed as to guilt." NT 12/5/05 at 151. Thus, the jury was instructed that the original jury was not required to decide which of the actors was the shooter. This instruction was unnecessary and resulted in confusion regarding the jury's obligations at the re-sentencing.

141.   One of the aggravating circumstances relied upon by the State was that Petitioner caused or directed the co-defendant to commit murder. The court instructed the jurors that they must find beyond a reasonable doubt that "defendant Stevenson caused or directed defendant Manley to kill Kristopher Heath." Id. at 145. The court read this portion of the instruction to the jury prior to the above erroneous instruction. Thus, the jurors were first told that they had to find that Petitioner caused or directed Manley to kill the victim and then, several minutes later, were informed that there was no need to decide who the shooter was. Surely, such inconsistent instructions resulted in serious confusion.

142.   This instruction also led to confusion regarding the other statutory aggravating factors. The first factor explained to the jury was that the murder was committed to prevent the victim's testimony in a criminal proceeding. Id. at 145. Again, this charge came before the erroneous instruction described above. It is certainly reasonable that the jury could have decided

60

that Petitioner did not have intent to kill, only to intimidate, as evidence tended to show he was not the shooter. In that situation, instructing the jury that it was not necessary to determine who the shooter was, would result in great confusion, and lessened the burden of proof.[30] This confusing instruction also affected the jury's consideration of the aggravating circumstance that the murder was the result of substantial planning. Applying this erroneous instruction to this aggravating circumstance, the jury was free to find that the murder was the result of substantial planning of only one of the two defendants. Because the jury was not required to determine who the shooter was, the jury was free to lump together the states of mind and intent of the defendants. Petitioner's right to individualized sentencing was violated in this manner, and he is entitled to a new penalty hearing. This claim should be considered in conjunction with all of the other instructional errors present in the sentencing phase.

143.    Prior counsel raised this issue at the trial level and on appeal. To the extent that counsel failed to fully brief and develop this claim on appeal, counsel was ineffective.

**XVII. PETITIONER'S RIGHT TO A FAIR SENTENCING WAS VIOLATED WHEN THE JURY AND THE SENTENCING COURT CONSIDERED AGGRAVATING CIRCUMSTANCES THAT WERE NOT PROVEN BEYOND A REASONABLE DOUBT OR TO A UNANIMOUS JURY.**

144.    Three of the statutory aggravating circumstances alleged by the State were not proven beyond a reasonable doubt and should not have been considered by the jury or the sentencing court. The evidence presented was insufficient to establish the existence of these

---

[30]The same is true for the third statutory aggravating circumstance, that the victim was killed in retaliation for providing information to police. Even though the jury did not unanimously find this circumstance, the error affected the jury's recommendation as there is no way to tell how many jurors used this circumstance in the weighing process and how the weighing was done. Delaware's sentencing scheme, which does not require weighing of circumstances beyond a reasonable doubt, and which fails to specifically instruct the jury regarding the weighing process, is unconstitutional on its face and as applied in this case. See Claim XI.

61

circumstances. Additionally, the aggravating circumstance that the victim was killed in

retaliation for providing information to police was duplicative of the aggravating circumstance

regarding the killing of a witness and constituted unconstitutional double counting, skewing the

weighing process and resulting in an unreliable sentence of death.

145.    The jury and the sentencing court found as an aggravating circumstance that

Petitioner caused or directed the co-defendant to commit murder. 11 Del.C. § 4209(e)(m). There

was no evidence whatsoever to support this circumstance. There was no evidence regarding any

conversations between the defendants or any agreement to commit murder. Indeed, the evidence

is equally consistent with an effort to intimidate or simply talk to the victim about his upcoming

testimony. No witnesses saw the shooter approach the victim or testified regarding any

interaction between them. The majority of witnesses saw nothing until after hearing the gun

shots. Finding that Petitioner directed Manley to kill Mr. Heath requires a leap that is not

supported beyond a reasonable doubt by the evidence.

146.    The jury and the sentencing court also found as an aggravating circumstance that

the murder was premeditated and the result of substantial planning. 11 Del.C. § 4209(e)(u).

Again, there was no evidence presented to support this circumstance. There is no evidence that

either defendant ever discussed the killing of this witness or that there was any plan at all. As

stated, the facts presented to the jury were equally consistent with an intent to merely discuss the

situation with the victim. No evidence was presented regarding any plan. Taking such a leap

requires surmise and conjecture that is inconsistent with the Eighth Amendment's requirement of

heightened reliability in capital proceedings.

147.    Nine members of the sentencing jury found that the killing was in retaliation for

the victim's providing information to police. There is no evidence that this is the case. No statements were made at the scene or any time thereafter to indicate this intent. Moreover, the consideration of this circumstance results in unconstitutional double counting. This circumstance is based upon the same facts and concepts as the first aggravating circumstance, that the killing was to prevent the victim's testimony. While the jury did not unanimously find this circumstance, it certainly played into the weighing process. See NT 12/5/05 at 143 (court's instructions that each juror is free to weigh any aggravating or mitigating circumstance regardless of whether other jurors found it).

148. Prior counsel were ineffective for failing to raise these issues at the trial level and on appeal. Counsel's performance was deficient as there could be no possible reason to fail raise such meritorious claims in a capital case. Petitioner was prejudiced as these errors resulted in an unconstitutional weighing and recommendation of death by a jury vote of ten to two.

**XVIII.    PETITIONER'S DEATH SENTENCE IS INVALID UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS BECAUSE THE STATE COURTS HAVE NEVER MADE A RELIABLE DETERMINATION AS TO WHETHER PETITIONER IS SUBJECT TO THE DEATH PENALTY AS ONE WHO HAS KILLED, ATTEMPTED TO KILL, INTENDED THAT A KILLING TAKE PLACE OR THAT LETHAL FORCE BE USED.**

149. The theory on which this case was tried makes it impossible to conclude that the jury's verdict rested on a finding that Mr. Stevenson killed or intended to kill. To the contrary, the prosecutor's theory at trial was that Mr. Manley did the shooting.

150. Before a death sentence is imposed, the jury must make an express, reliable determination as to whether the defendant is subject to death as one who has killed, attempted to kill, intended that a killing take place or that lethal force be used. In this case, the jury never made the constitutionally-mandated determination that Mr. Stevenson is eligible for the death

penalty as having killed, attempted to kill, intended that a killing take place or that lethal force be used.

151.    The failure of the state court to make the constitutionally-mandated death eligibility findings was prejudicial *per se* and no showing of actual prejudice is required. In the alternative, Mr. Stevenson suffered substantial actual prejudice due to the failure of the state courts to make such findings.  Evidence was presented at trial indicating that Mr. Stevenson's co-defendant, and not Mr. Stevenson, fired the shots that killed Mr. Heath.  Throughout trial, his prosecutors never attempted to show or argue otherwise.

152.    Because Mr. Stevenson did not have the culpability required to be eligible for the death penalty, the State cannot show, beyond a reasonable doubt, that the failure to make the constitutionally-mandated culpability determinations did not affect the sentence.  Because the theory on which the jury's verdict rests is unclear, there is no rational way for a federal habeas court to treat the failure to make explicit culpability findings as harmless beyond a reasonable doubt. The failure to make the requisite determination as to culpability substantially and injuriously affected the sentence and rendered the sentencing proceedings fundamentally unfair.

153.    Trial counsel requested that the court instruct the jury consistent with United States Supreme Court precedent in this regard.  See Enmund/Tyson Instruction, Appendix.  The court failed to give the instruction.  The Delaware Supreme Court denied the claim of error on this basis on appeal.  This decision was contrary to, or was an unreasonable application of settled law.

**XIX.** **Petitioner's Right to a Fair Sentencing Hearing Was Violated When the Prosecution Was Improperly Permitted to Read Prior Testimony of Witnesses Who Were Not Unavailable and Where Counsel Failed to Object.**

154.    As stated in the Procedural History, the Delaware Supreme Court ordered a new penalty phase in this case.  At the new penalty hearing, the prosecution was allowed to read the testimony  of nine witnesses from the original trial.  The State had alleged that these witnesses were unavailable and the court permitted the testimony to be presented to the jury in that manner.  This procedure violated Petitioner's right to confrontation as guaranteed by the Sixth Amendment.  Moreover, Petitioner's attorneys were ineffective for failing to object and for failing to challenge whether the witnesses were, in fact, unavailable.

155.    Two of the witnesses, Phillip Hudson and Lance Thompson, have informed undersigned counsel that they were not unavailable.  They were never contacted at the time of the retrial, but would have appeared if subpoenaed.  Both of these individuals were eyewitnesses to the crime.  Their testimony was crucial to the determination of the appropriate sentence.

156.    The remaining witnesses whose testimony was read to the jury, included Michael Chandler, Anna Hawley, Galicano Inguito, Mario Cruz, Richard Wohlgemuth, William Kinard and Rand Townley.  Prior to the reading of the testimony of Chandler, Hudson and Thompson, the prosecutor made conclusory comments about the unavailability of the witnesses.  NT 11/17/05 at 5-6.  Petitioner's attorney was asked if he had any response and said no.  Id. at 6.  Thereafter, the question of the scope of the prior testimony was raised.  In other words, whether the entire cross examination would be read to the jury over defense objections.  See id. at 18-26.  The court ruled that the State could introduce whatever testimony it felt was relevant.  Id. at 27.

Certainly, the issues relevant at the guilt phase of the trial ten years earlier were not the same as the strategy employed by counsel in the re-sentencing. The court's ruling unfairly tied counsel to previous counsel's strategy in violation of due process and the Eighth Amendment.

157. To the extent that counsel failed to object to the introduction of the prior testimony and failed to fully preserve these issues, counsel was ineffective. Counsel was also ineffective for failing to raise this issue on appeal.

## XX. IN ADDITION TO THE FOREGOING CLAIMS, PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED IN THE FOLLOWING WAYS.

158. All allegations set forth in other sections of this pleading are fully incorporated as if restated here. Due to the errors discussed herein, Petitioner was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution including, but not limited to: due process; equal protection; fair trial by representative jury; reliable, individualized capital sentencing; meaningful, valid direct appeal and post-conviction review; and effective assistance of counsel.

159. Trial counsel was ineffective for failing to litigate suppression issues. Counsel filed a motion to suppress identification testimony, but failed to litigate the issue. It appears that counsel did not litigate the issue of Dorothy Hackett's identification, because the prosecutor informed counsel that she would not be called. However, the co-defendant called her as a witness at the guilt phase and she identified Petitioner as the shooter. NT 11/8/96 at 20. Counsel was ineffective for failing to attempt to preclude this evidence.

160. The trial court erred in failing to grant Petitioner a hearing on his motion to suppress physical evidence.

161.    Trial counsel were ineffective for failing to present alibi.

162.    Trial counsel were ineffective for failing to object to evidence of post-arrest silence.  See NT 10/31/96 at 141 (testimony of Officer Peter Stark).

163.    Petitioner's right to a fair and impartial jury, made up of a cross-section of the community, was violated by the trial court's disparate treatment of prospective jurors based on race and gender, during jury selection at the first trial.

164.    To the extent these claims were inadequately and/or not fully raised in state court, all prior counsel provided ineffective assistance.

## XXI.    PETITIONER'S CONVICTION AND SENTENCE SHOULD BE VACATED BECAUSE OF INEFFECTIVE ASSISTANCE OF TRIAL, DIRECT APPEAL, AND POST-CONVICTION, AND RE-SENTENCING COUNSEL.

165.    To the extent that trial counsel failed to raise and reasonably litigate the issues described throughout this Petition, counsel was ineffective in violation of the Sixth and Fourteenth Amendments.  All of these issues have arguable merit.  Failure to raise such issues constitutes deficient performance.  Petitioner was prejudiced by trial counsel's failures.

166.    To the extent that appellate counsel, Leo Ramunno, failed to raise and reasonably litigate the issues described throughout this Petition, counsel was ineffective in violation of the Sixth and Fourteenth Amendments.  All of these issues have arguable merit.  Failure to raise such issues constitutes deficient performance.  Petitioner was prejudiced by appellate counsel's failures.

167.    To the extent that post-conviction counsel, first Leo Ramunno, then Jerome Capone, failed to raise and reasonably litigate the issues described throughout this Petition, counsel was ineffective in violation of the Sixth and Fourteenth Amendments.  All of these

67

issues have arguable merit. Failure to raise such issues constitutes deficient performance. Petitioner was prejudiced by counsel's failures.

168.    To the extent that trial counsel at Petitioner's 2005 sentencing failed to raise and reasonably litigate the issues described throughout this Petition, counsel was ineffective in violation of the Sixth and Fourteenth Amendments. All of these issues have arguable merit. Failure to raise such issues constitutes deficient performance. Petitioner was prejudiced by trial counsel's failures.

169.    Petitioner's appeal from his sentence of death on re-sentencing was handled in a particularly atrocious manner. Counsel raised two issues in this capital appeal. The argument section of the brief filed with the Delaware Supreme Court comprised a mere nine pages, double spaced. There is no excuse for such deficient performance. Petitioner was severely prejudiced as is plainly established throughout this Petition.

## XXII.  PETITIONER IS ENTITLED TO RELIEF BECAUSE OF THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS DESCRIBED HEREIN.

170.    Constitutional claims of error are to be considered cumulatively as well as individually, and cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief. If the court finds cumulative prejudice, it eliminates the need to analyze the individual prejudicial effect of each deficiency.

171.    The circumstances of this case demonstrate that the cumulative effect of counsel's serious failures, and the constitutional errors committed by the court and the prosecutor, so undermined the fairness of the trial and sentencing proceedings that Petitioner's conviction and/or death sentence must be vacated. Given all the factors discussed throughout the Petition,

Petitioner is entitled to habeas relief.

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, Petitioner prays that the Court grant him the

following relief:

A)   That Petitioner be granted such discovery as is necessary for full and fair
     resolution of the claims contained in this Petition;

B)   That leave to amend this Petition be granted, as may be appropriate;

C)   That an evidentiary hearing be conducted on all disputed issues of fact;

D)   That Petitioner's convictions and death sentence be vacated;

E)   That all other appropriate relief be granted.

Respectfully submitted,

/s/ Michael Wiseman
Michael Wiseman
Pa Bar No.48308
Shawn Nolan
Rebecca Blaskey
Maria Pulzetti
Community Federal Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, Pennsylvania 19106
(215) 928-0520

Dated: February 15, 2008
       Philadelphia, PA

## <u>CERTIFICATE OF SERVICE</u>

On this 15th day of February, 2008, I delivered by first class United States mail and via e-filing system, a copy of the *Petition for a Writ of Habeas Corpus* to:

Loren C. Meyers, Esquire
Chief of Appeals
820 North French Street, 7th Floor
Wilmington, DE 19801

SWORN TO AND SUBSCRIBED before me the day and year aforesaid.

/s/ Michael Wiseman
Michael Wiseman
Attorney At Law